*In re* COOPER, Petitioner.

ORIGINAL.

No. 6.  Original.  Argued November 9, 10, 1891. — Decided February 29, 1892.

The District Court for the District of Alaska has jurisdiction in admiralty to forfeit vessels for violating the provisions of Rev. Stat. § 1956 on any of the navigable waters of the United States which were acquired by the treaty with Russia, concluded March 30, 1857, 15 Stat. 539.

Prohibition will not go after judgment and sentence, unless want of jurisdiction appears on the face of the proceedings; but, before judgment, the superior court can examine not simply the process and pleadings technically of record, but also the facts and evidence upon which action was taken.

United States District Courts, sitting in admiralty, are courts of superior jurisdiction, and every intendment is made in favor of their decrees; and when it appears that the court had jurisdiction of the subject matter and either that the defendant was duly served with process or that he voluntarily appeared and made defence, the decree is not open collaterally to any inquiry upon the merits or jurisdiction dependent on those facts.

On an application for a writ of prohibition, the inquiry being confined to the matter of jurisdiction, only the record proper should be looked into, and not documents and other evidence in addition to the record which may be sent up under the provisions of Rev. Stat. § 698.

The latter part of section 7 of the act of May 17, 1884, 23 Stat. 24, 26, may be read as follows: " And the final judgments and decrees of said District Court of Alaska may be reviewed by the Supreme Court of the United States as in other cases; " and, being so read, its meaning is that this court may review the final judgments or decrees of that court, as in cases of the same kind from other courts.

When a party aggrieved by a judgment has an appeal to this court which becomes inefficacious through his neglect, a writ of prohibition to prevent the enforcement of the judgment will not issue from this court.

The act of February 16, 1875, 18 Stat. 315, c. 77, § 1, applies to appeals taken from decrees of the District Court of the United States for the District of Alaska, sitting in admiralty.

At a time when a diplomatic correspondence was going on between the United States and Great Britain respecting the extent of the jurisdiction of the former in the waters of Behring Sea, a libel in admiralty was filed in the District Court of Alaska, alleging a seizure by the United States authorities of a vessel "within the limits of Alaska Territory, and in the waters thereof and within the civil and judicial District of Alaska," to wit: " Within the waters of that portion of Behring Sea belonging to the United States and said district, on waters navigable from the sea by vessels of ten or more tons burden," and charging that " the said vessel and her captain, officers and crew were then and there found engaged in killing fur seals within the limits of Alaska Territory and in the said waters thereof, in violation," etc. The findings of fact followed this description, and described the act complained of as done "within the waters of Alaska." No request was made to have the findings made more specific as to the place where the offence was committed. The vessel being condemned, the claimants appealed to this court. The appeal was duly entered and docketed, and was then dismissed on application of the appellant, who applied for leave to file an application for a writ of prohibition to restrain the court below from enforcing the sen-

tence or the decree of condemnation. Leave being granted, the petition was filed, and it is now *Held*,

(1) That the legal inference from the findings of fact is, that the act took place within the jurisdiction of the United States;

(2) That an appeal lay to this court from the decree of the District Court;

(3) That, the District Court having found the facts, this court would be limited, on appeal, to the consideration of the questions of law presented by the record;

(4) That the District Court on the pleadings and facts found had jurisdiction of the case, and the petitioner might have prosecuted an appeal; and that the appeal taken was insufficient for the petitioner's purposes, because of his neglect to have included in the findings the exact locality of the seizure;

(5) That for this reason the writ of prohibition should not issue: the court resting its denial of it on this ground, although it might have placed it upon the well settled principle that an application to a court to review the action of the political department of the government, upon a question pending between it and a foreign power, and to determine whether the government was right or wrong, made while diplomatic negotiations were still going on, should be denied.

THE court stated the case as follows:

This is an application for a writ of prohibition to the District Court of the United States for the District of Alaska, to restrain the enforcement of a sentence of forfeiture and condemnation entered in that court, September 19, 1887, on a libel filed by the United States against the schooner W. P. Sayward, upon the ground that that court was without jurisdiction in the premises. The petitioner, Cooper, is the owner of the vessel, and with his petition a suggestion was presented by Sir John Thompson, K. C. M. G., Her Britannic Majesty's Attorney General of Canada, with the knowledge and approval of the Imperial government of Great Britain, requesting the aid of the court for the claimant, a subject of her Britannic Majesty.

The motion for leave to file the application was made on the twelfth of January, 1891, and leave was granted on the second day of February. The application having accordingly been filed, a rule was issued against the judge of the District

Court of Alaska to show cause why the writ should not go. The petition is set out *in extenso* in *In re Cooper, Petitioner,* 138 U. S. 404. The main averments are that the schooner W. P. Sayward, a British vessel, while lawfully sailing upon the high seas in latitude 44° 43' north and longitude 167° 51' west, and fifty-nine miles from any land whatsoever, was forcibly seized by an armed revenue vessel of the United States and forcibly carried into the port of Sitka, and there forcibly detained and delivered to the United States marshal, and by the attorney for the United States of the District of Alaska libelled in the District Court, and by said court condemned for having killed fur seal at the place of seizure. It was further averred that the decree of forfeiture was made and entered September 19, 1887; that the petitioner, having been admitted as the actual owner of the said schooner as claimant, appealed to this court April 26, 1888, and docketed said appeal here October 30, 1888, but dismissed the same, (January 12, 1891,) because advised that an appeal would not lie, and that the decree was and is a nullity; and that all the matters of fact alleged in the petition, save those of which this court takes judicial notice, appear by the record and proceedings of the District Court; and it was claimed in argument that the petitioner, having referred to the original record and proceedings of the District Court, was entitled to have the same read and considered as part of his case in this court, and he accordingly filed a complete and authenticated transcript of the entire proceedings in the District Court, as he alleged.

A return was made in due course by John S. Bugbee, judge of the court in question, stating that he was not such judge at the time the decree was entered, but was appointed and qualified on December 7, 1889, and he thereupon sets forth "the final record of the cause in which said decree of forfeiture was made and entered, as prepared under section 750 of the Revised Statutes of the United States from the files, minutes and journal of said District Court of the United States, District of Alaska," as follows :

The libel dated and filed September 13, 1887 :

"The libel of information of M. D. Ball, attorney of the

United States, for the District of Alaska, who prosecutes on behalf of the said United States in the name and on behalf of the said United States, alleges and informs as follows, to wit:

"That L. G. Shepard, an officer in the revenue marine service of the United States, duly commissioned by the President of the United States, in command of the United States revenue cutter Rush, and on special duty in the waters of the District of Alaska, heretofore, to wit, on the 9th day of July, A.D. 1887, within the limits of Alaska Territory and in the waters thereof, and within the civil and judicial district of Alaska, to wit, within the waters of that portion of Behring Sea belonging to the United States and said district, on waters navigable from the sea by vessels of ten or more tons burden, seized the schooner W. P. Sayward, of Victoria, B. C., her tackle, apparel, boats, cargo and furniture, being the property of some person or persons unknown to said attorney.

"The property is more particularly described as follows, to wit: Schooner W. P. Sayward, of Victoria, B. C., of 59 and $\frac{79}{100}$ tons burden, as per register, standing and running rigging, sails, chronometer, and nautical instruments, clock, lamps, carpenter's tools, books, two anchors, casks, cooking and table utensils, provisions and 477 fur-seal skins and all other property found upon or appurtenant to said schooner.

"That L. G. Shepard was then and there duly commissioned and authorized by the proper department of the United States to make said seizure.

"That all said property was then and there seized as forfeited to the United States for the following causes:

"That the said vessel and her captain, officers and crew were then and there found engaged in killing fur-seals within the limits of Alaska Territory, and in the said waters thereof, in violation of section 1956 of the Revised Statutes of the United States; that all the said property, after being seized as aforesaid, was brought into the port of Sitka, in said district, and turned over to the United States marshal of this district, with the exception of the 477 fur-seal skins, which latter were brought into the port of Oonalaska, in said Territory, and delivered into the keeping of Isaac Anderson, a deputy United

States marshal of this district, and all of said property is now within the judicial district of Alaska, United States of America; and said M. D. Ball, attorney as aforesaid, further informs and alleges that on the 9th day of July, A.D. 1887, Geo. R. Ferry and certain other persons whose names are to the said United States attorney unknown, who were then and there engaged on board of said schooner W. P. Sayward as seamen and seal hunters, did, under the directions and by the authority of Geo. R. Ferry, then and there master of said schooner, engage in killing and did kill, in the Territory and District of Alaska and in the waters thereof, thirty fur seals, in violation of section 1956 of the Revised Statutes of the United States in such cases made and provided.

"That the said 477 fur-seal skins and other goods so seized on board the schooner W. P. Sayward constituted the cargo of said schooner at the time of the killing of said fur-seals and at the time of said seizure.

"And said attorney saith that all and singular the premises were and are true, and within the admiralty and maritime jurisdiction of the United States and of this honorable court, and that by reason thereof and by force of the statutes in such cases made and provided, the aforementioned schooner, being a vessel of 59.79 tons burden, and her said apparel, tackle, boats, cargo and furniture became and are forfeited to the use of the United States.

"Wherefore, the said attorney prays that the usual process and monition of this honorable court issue in this behalf against said schooner and all said hereinbefore described property to enforce the forfeiture thereof, and requiring notice to be given to all persons to appear and show cause on the return day of said process why said forfeiture should not be decreed, and that after due proceedings are had all said property be adjudged, decreed and condemned as forfeited to the use of the United States, and for such other relief as may be proper in the premises."

The monition dated September 15, 1887, and returned and filed September 19, 1887; and the return.

Order of court of September 15, 1887, granting leave to the

proctor for claimants to file claim of master for owner and the claim; also order granting leave to proctor for claimants to file a demurrer to the libel; and the demurrer.

Order of court overruling the demurrer on the same day and leave granted to file answer; and the answer:

"And now comes George R. Ferry, master, as aforesaid, and for answer to the libel of information filed herein, says:

"1st. He admits that L. G. Shepard was an officer of the United States revenue marine service, duly commissioned, and that he was, at the time the property proceeded against herein was seized, in command of the United States revenue-cutter Rush and on official duty at the time the said seizure was made, and was then and there duly commissioned and authorized by the proper department of the United States to make said seizure, but denies that said seizure was made within the waters of Alaska Territory or within the civil and judicial district of Alaska or in any portion of Behring Sea belonging to the United States, or upon any other waters belonging to libellants navigable from the sea by vessels of ten tons or over.

"2nd. Denies that said vessel, her captain, officers, and crew, were then and there found engaged in killing fur seals within the limits of Alaska Territory, or in the waters thereof, or that they were then and there violating any law of the United States.

"3rd. Denies that on the ninth day of July, A.D. 1887, any other person or persons did then and there, under the direction and authority of the said George R. Ferry, or any other person, or at all, kill any fur seal within the District of Alaska, or in the waters thereof.

"4th. Denies that the property proceeded against in this cause, or any portion thereof, ever became forfeited to the United States; wherefore the said claimant prays that the libel of information filed herein may be dismissed, and for any other just and equitable relief as to this court may seem meet and proper."

September 19, 1887, leave granted proctor for owners to file a waiver of the publication and posting of the notice of the

libel and seizure of the property granted, and waiver filed the same day:

"And now comes W. Clark, Esq., proctor for the owners of the above-named schooner, as appears by their claim filed herein, and on behalf of said owners, and being authorized thereto, waives said owners' right to publication and posting of the notice of the libel and seizure of the property being proceeded against in this cause, and waives also time of hearing, and announces himself ready to proceed to trial."

Record entry of September 19, 1887:

"This cause having been tried and submitted, the court, from the evidence, finds the following facts and conclusions of law:

"1st. That on the 9th day of July, 1887, and theretofore, the master and crew of the defendant vessel were engaged in killing and did kill fur seals in that portion of Behring Sea ceded by Russia to the United States by the treaty of March, 1867, and within the waters of Alaska, in violation of section 1956 of the Revised Statutes of the United States, and that the promiscuous shooting of fur-bearing animals in the waters adjacent to the islands of St. Paul and St. George and in that portion of Behring Sea east of 193d degree of west longitude has a tendency to frighten and prevent the said animals from going upon these islands, as they have been accustomed to in the past.

"2d. That on the said 9th day of July, 1887, said vessel, her furniture, apparel, tackle, cargo and 477 fur-seal skins were seized in said waters by the commanding officer of the United States revenue-cutter Rush, then and there engaged in the revenue marine service of the United States.

"3d. That said commanding officer was duly commissioned by the President of the United States, and made such seizure under the direction and by the authority of the Treasury Department of the United States.

"4th. That said property so seized was delivered by said commanding officer of said cutter to the United States marshal of the District of Alaska, and is now within the jurisdiction of the court.

" As conclusions of law, the court finds that the plaintiff is entitled to a decree of forfeiture against said vessel, her tackle, apparel, furniture, cargo and the said 477 fur-seal skins."

Motion in arrest of decree, filed September 19, 1887:

" At this time comes W. Clark, proctor for claimants, and moves the court to arrest the decree of forfeiture in the said cause for the following reasons, to wit:

" 1st. That the libel of information herein does not state facts sufficient in law to enable the United States to have and maintain this action for the forfeiture of the property seized herein.

" 2d. That the evidence produced on the part of the United States in this cause is not sufficient upon which to base a decree of forfeiture.

" 3d. That from the evidence produced on the part of the United States it appears that this court has no jurisdiction over the subject-matter of this cause.

" 4th. That the act of Congress under which the seizure herein was made is contrary to the spirit of international law, and *ultra vires*, in that it purports to give the United States jurisdiction over a portion of the high seas more than three marine leagues from its shores, and purports to establish an international boundary line in mid-ocean with no definite terminal points and impossible to determine by absolute measurement or clearly define by marks.

" Therefore claimants pray that said decree may be forever arrested and this cause dismissed."

Order denying motion, and decree of September 19, 1887:

" The marshal having returned on the monition issued to him in the above-entitled action that in obedience thereto he had attached the said schooner W. P. Sayward, her tackle, apparel, boats, cargo and furniture, and proctor for claimants, on behalf of said owners, having waived said owners' right to publication and posting of the notice of the libel and seizure, and also time of hearing, and has given due notice to all persons claiming the same to appear before this court on the 19th day of Sept., 1887, at 11 o'clock A.M., at the District of Alaska, United States of America, then and there to interpose

their claims and make their allegations in that behalf, and Geo. R. Ferry, the captain of said vessel, having heretofore filed a claim to all of said property on behalf of J. D. Warren and Andrew Laing, of Victoria, B. C., and no other persons having appeared and no other claims or allegations having been made or filed by any other person or persons, and the usual proclamation having been made, and said cause having been heard this day by consent of parties, on the pleadings and proofs, M. D. Ball, Esq., U. S. dist. atty., by A. K. Delaney, Esq., of counsel in that behalf, appearing as advocate for said libellant, and W. Clark, Esq., as advocate for said claimants, and said cause having been submitted to the court for decision, and due deliberation being had in the premises, and the court having filed his findings and conclusions of law herein, it is now thereupon ordered, sentenced and decreed as follows:

"1st. That all persons whosoever, other than said claimants be, and they are hereby, decreed in contumacy and default.

"2d. That said schooner W. P. Sayward, her tackle, apparel, boats, and furniture, and her cargo of 477 fur-seal skins, now in the custody of the deputy U. S. marshal at Oonalaska, and all property found upon or appurtenant to said schooner be, and the same are hereby, condemned as forfeited to the use of the United States.

"3d. That unless an appeal be taken to this decree within the time limited and prescribed by law and the rules of court, the usual writ of *venditioni exponas* will be issued to the marshal, commanding him to sell all the said property and bring the proceeds unto this court, to be distributed according to law. Costs to be taxed and are awarded against said claimants."

Motion for a stay of proceedings dated October 3, 1887, and filed and overruled December 9, 1887; motion for a stay of three months considered and overruled same day; motion for leave to appeal filed and granted same day; motion to renew leave to appeal made and overruled April 14, 1888, but subsequently granted April 16. April 19, 1888, motion for leave to file stipulation and consent that vessel be thereupon

discharged, and order to that effect upon stipulation filed and approved, as follows :

. " Whereas a libel of information was filed in the within cause on the 13th day of September, 1887, in the above court, by the honorable M. Ball, U. S. district attorney for the District of Alaska, against the schooner W. P. Sayward, her tackle, apparel, furniture and cargo, for the reasons and causes in said libel mentioned and set forth; and whereas a decree of forfeiture was on the 19th day of September, 1887, rendered against the said vessel, her tackle, apparel, furniture, and cargo, and against Thomas Henry Cooper, of San Francisco, intervening as the sole and only claimant to said vessel, tackle, apparel, furniture and cargo; and whereas the said vessel, tackle, apparel, furniture and cargo, are now in the custody of the U. S. marshal for the said District of Alaska under process issued from this court, and in pursuance of the prayer of the said libel ; and, whereas the value of the said vessel, her tackle, apparel, furniture and cargo, has been appraised at $7289.50, as appears by the report of the appraisers duly appointed and sworn by this court, and on file herein ; and whereas the said Cooper, claimant as aforesaid, is desirous of, and purposes, appealing from the said decree of this honorable court :

" Now, therefore, we the undersigned, the stipulators, submitting ourselves to the jurisdiction of this court, do acknowledge ourselves to be bound unto the United States of America, the said claimant, Thomas Henry Cooper, as principal, and Bailey Gatzert and Jacob Furth as sureties, jointly and severally, in the sum of $7289.50, lawful money of the United States, hereby consenting and agreeing that a summary decree may be rendered against us, and each of us, for the above appraised value, with interest thereon from this date, and that execution may thereon issue against our goods, chattels and lands for the payment thereof or any part thereof which shall be ordered or decreed : Upon condition, nevertheless, that if the undersigned stipulators shall prosecute their said appeal without unnecessary delay, and abide by any final decree that may be rendered by the Supreme Court of the United States

of America, to which this cause may be appealed, and in the event of the said decree of this honorable court being affirmed by such court of appellate jurisdiction, then if said stipulators pay the amount named in this stipulation into this court this stipulation to be void, otherwise to remain in full force and virtue."

Bond for costs on appeal filed and approved, and April 27, 1888, leave granted to file affidavit on appeal, and appeal to the Supreme Court of the United States granted, and affidavit of James Douglas Warren, as agent for the claimant, and petition for appeal filed, and appeal allowed.

July 18, 1888, record amended so as to substitute the name of Cooper as owner for that of Warren.

The return of the District Judge thus concludes:

"Respondent further says that he is in receipt of an uncertified copy of the dismissal of the appeal taken to the Supreme Court from said decree of condemnation.

"Further answering, respondent says that he is advised that in determining his power and duty to enforce said decree as judge of said District Court of the United States, District of Alaska, he is limited to and concluded by an examination of the final record of the admiralty proceeding in which such decree was entered, as set out above in accordance with section 750 of the Revised Statutes of the United States. And he is further advised that this court in considering whether a writ should issue against him to prohibit him from enforcing said decree, is in like manner limited to and concluded by said record as above disclosed. Respondent respectfully submits that upon such record the District Court of the United States, District of Alaska, had full jurisdiction to make and enter the decree, and that it is the duty of this respondent to enforce such decree upon receiving the mandate from the Supreme Court issued in due course upon the dismissal of the appeal. Because of this record respondent is advised that all other facts stated in the petition accompanying the rule to show cause served upon this respondent are irrelevant and incompetent, and need not be answered by him.

"Respondent respectfully submits to the consideration of

the court whether upon the foregoing allegations of this return the writ of prohibition should issue against him."

It is contended by the petitioner's counsel that the return is on its face improper and insufficient: *First*, because the respondent was bound, if he submitted "anything disclosed by the files, journal and minutes of his court for the consideration of this court," to submit everything. *Second*, because the record returned by respondent, as prepared under section 750, Revised Statutes, is not authenticated "in any manner known to the law and cannot be noticed by the court." *Third*, because the respondent had "no right to decide for himself without allowing this court the opportunity to examine the correctness of his decision, as matter of law, that any facts stated in a petition accompanying a rule to show cause, issuing out of this court and served upon said judge, are 'irrelevant and incompetent.'" *Fourth*, because the record is on its face incomplete, since it shows a motion in arrest of judgment filed and overruled, and the evidence on file was properly a part of said motion. *Fifth*, because the record set out in the return "does not show jurisdiction in the District Court to make and enter a decree of forfeiture against the W. P. Sayward, but does show that said court had no jurisdiction to make and enter said decree."

*Mr. Joseph H. Choate* and *Mr. Calderon Carlisle* for the petitioner.

The question of this court's jurisdiction to issue the writ in this case is no longer open, as it has been adjudicated at the former hearing. *In re Cooper*, 138 U. S. 404, 414.

The case as now presented involves, at the outset and as preliminary to the main question, the consideration of two propositions, which may be stated as follows: (1) In determining whether or not the said court had jurisdiction, is this court limited to the examination of any particular portion of the record, or is its examination coextensive with the examination and acts of the condemning court? (2) Does an examination of the entire record and proceedings affirmatively establish the facts set forth in the petition for the writ?

I. In determining the question of jurisdiction in the court below, is the examination by this court limited to any particular portion of the proceedings, or is the examination coextensive with the examination and acts of the condemning court?

The issuing of writs of prohibition is part of the appellate jurisdiction of this court, and in its exercise, the superior court not only may but must, it is submitted, revise and review the whole proceedings of the inferior court of admiralty. The same matter, showing want of jurisdiction, which may be averred before sentence, as good ground of prohibition, must, if proved in the proceedings of the inferior court furnish good ground for prohibition after sentence. This is well illustrated by comparing the case of *The Cassius*, 2 Dall. 365, with that of *The Exchange*, 7 Cranch, 116.

It was urged, at the former argument upon motion for leave to file, that the phrase "the face of the proceedings" meant the libel, or pleadings, at most, and not the entire proceedings, and several early English cases were cited as supporting that view, but it is submitted that they do not, in any sense, so incline. On the contrary, that the court will examine the entire proceedings and pass upon all questions going to the jurisdiction of the court below, upon which that court did or could pass, abundantly appears by a series of decisions, the accuracy of which has never been questioned, and the authority of which is undoubted. *Jones* v. *Owens*, 5 Dowl. & L. 669; *Marsden* v. *Wardle*, 3 El. & Bl. 695; *Thompson* v. *Ingham*, 14 Q. B. 710; *King* v. *Broom*, 12 Mod. 134; *Elston* v. *Rose*, L. R. 4 Q. B. 5; *S. C. sub nom. Elstone* v. *Rose*, 9 B. & S. 509; *Hunt* v. *North Staffordshire Railway*, 2 H. & N. 451; *Ex parte Heyworth*, 14 Q. B. D. 49; *Brown* v. *Cocking*, 9 B. & S. 503; *Jones* v. *Currey*, 2 Lowndes, Max. & Poll. 474; *Joseph* v. *Henry*, 1 Lowndes, Max. & Poll. 388; *Mayor of London* v. *Cox*, L. R. 2 H. L. 239.

Upon these authorities, and upon the principles of common sense, it must therefore be admitted that a superior court has the power, right and duty to examine all matters touching the question of jurisdiction which were before the court below, and that it can never be said that in a case where the

important question of the jurisdiction of a court is involved a
superior court can solemnly adjudicate, from a view of one
part of the proceedings, that the court below had or had not
jurisdiction, when, by turning a leaf in its record, the contrary
would conclusively appear.

II. Upon the face of the proceedings all the facts averred
in the petition fully appear. The record nowhere discloses
that the Sayward was ever, at any time prior to the seizure,
at a closer proximity to any shores of the United States than
ten miles; and there is no evidence of the killing of seal by
the master or crew of the vessel at any particular place. The
positions of the vessel are given in her log, and upon reference
to the official map of the Coast and Geodetic Survey, as shown
by the certificate of the officer in charge thereof, the nearest
of said positions to any land was ten miles, and the pass of
the four mountains through which she entered the Behring
Sea is twenty-two miles wide between land at its narrowest
point.

In this connection the language of this court applicable to
fancied evidence becomes appropriate: "The rule in such
cases is, that if there be a total defect of evidence to prove
the essential fact, and the court find it without proof, the ac-
tion of the court is void." *Lamp Chimney Co.* v. *Brass &
Copper Co.*, 91 U. S. 656, 659. And, as said in *Brown* v.
*Cocking*, 9 B. & S. 503, 509, a case of prohibition before re-
ferred to, " if it decides without evidence that a case is within
its jurisdiction . . . this court will interfere."

The petitioner's case is not weakened by the narrower con-
tention as to the face of the proceedings made by the respond-
ent in his return to the rule. That this vessel was a British
vessel, appears on the face of the libel wherein she is described
as "schooner W. P. Sayward of Victoria, B. C., of 59 and
$\frac{79}{100}$ tons burden as per register." That the place of seizure
and the place of the offence was on the high seas appears on
the face of this so-called final record. The libel alleged that
said seizure was made "within the waters of that portion of
Behring Sea belonging to the United States," and that the
vessel, her captain and crew, were "then and there" found

engaged in killing fur seals "in said waters." It is confidently submitted, as matter of law, that no portion of Behring Sea belongs to the United States.

III. When Congress, in section 1956 of the Revised Statutes, speaks of "Alaska Territory and the waters thereof," it can only mean (as far as the sea is concerned) three miles or a marine league from the shore of the continent of America, or from the shores of one of the adjacent islands, which is all that can be claimed under treaty or the law of nations.

The amendatory act of March 3, 1889, does not in any way enlarge the effect of section 1956, because we can get no light on the meaning of the words "all the dominion of the United States in the waters of Behring Sea" from the words of the treaty, and because the law of nations limits the "dominion" of any nation in the waters of any sea to three miles or a marine league from the shore.

Assuming that the court is bound to follow and execute the law as laid down by Congress, it still remains clear that Congress never contemplated the exclusion of the vessels of other nations from the right of navigation and fishing outside of our territorial waters bounded by the marine league, and that there was no law for the seizure by the Secretary of the Treasury of a British vessel so engaged. From the public proceedings of the two Houses of Congress, it appears that the Senate distinctly refused to define the extent of the dominion of the United States in Behring Sea, and that the House consented to abandon its purpose to define that extent by municipal law; while the act of Congress of March 3, 1889, representing the final determination of Congress not to undertake to define the extent of the dominion of the United States in Behring Sea was approved by the President.

IV. The Sayward, being a British vessel, was exempt on the high seas, fifty-nine miles from land, from the jurisdiction of the United States, its laws and its courts. 1 Phil. Int. Law, 364; Wheaton's Int. Law, 119; *The Exchange*, 7 Cranch, 116; *The Santissima Trinidad*, 7 Wheat. 283; *Crapo* v. *Kelly*, 16 Wall. 610; *Wilson* v. *McNamee*, 102 U. S. 572; Lawrence's Wheaton, 266, n.; *Le Louis*, 2 Dodson, 210; *The Antelope*, 10

Wheat. 66; Dana's Wheaton, 258, n.; Mr. Webster to Lord Ashburton, (1842), 6 Webster's Works, 320; Wharton's Dig. Int. Law, pp. 106 to 110.

V. The power and duty of this court to decide whether the Alaska court had or had not jurisdiction, cannot be affected by any action of the executive. The political departments of the government having before them the question of "the extent of the dominion of the United States in the Behring Sea," which they could, doubtless, by conjoint action have determined so as to bind the courts, have chosen neither to determine the extent of the dominion of the United States nor to make any provision of law by which that extent is to be determined by the executive. The determination of that extent is, therefore, by the Constitution and laws of the United States made a duty of this court in the case at bar, involving the legality of the seizure and condemnation of a foreign vessel, alleged to be in violation of the law of nations, and without any warrant of any law of the United States.

The question of the legality of the seizure of British vessels in Behring Sea by the United States is a question of law, not only under the law of nations, but under the municipal law of the United States. The judiciary is not asked to overrule the executive and Congress in a position which they have taken towards Great Britain, but to do, what it cannot avoid doing in a case involving private right — to construe acts of Congress and a treaty, which are all parts of the supreme law of the land, and which leave to its construction the true meaning of the words, "the Territory of Alaska and the waters thereof" and "dominion of the United States in Behring Sea." With the broader international question this court is not asked by counsel for petitioner to concern itself; and even that is a matter not between the United States and Great Britain, but between the United States and the civilized world, before which the Congress of the United States has distinctly refused to assert, by the mere force of a municipal law, any extent of dominion not recognized by the law of nations.

While it is plain that within its lawful sphere the executive cannot be either superseded or overruled by this court, it can-

not be admitted that this court can decline to issue the writ, because its issuance, according to law, might affect some contention of the executive. *Cohens* v. *Virginia*, 6 Wheat. 264; *Ex parte Milligan*, 4 Wall. 2.

This court has had to deal with the action of executive departments in many cases. *Gelston* v. *Hoyt*, 3 Wheat. 246; *Williams* v. *Suffolk Insurance Co.*, 13 Pet. 415; *Kennett* v. *Chambers*, 14 How. 38, as to the recognition of a new State: *United States* v. *Palmer*, 3 Wheat. 610; *The Divina Pastora*, 4 Wheat. 52, as to a civil war in another country: *Foster* v. *Neilson*, 2 Pet. 253; *Garcia* v. *Lee*, 12 Pet. 511, as to boundaries: *Frelinghuysen* v. *Key*, 110 U. S. 63; *Alling* v. *United States*, 114 U. S. 562; *Jones* v. *United States*, 137 U. S. 202; *United States* v. *Rauscher*, 119 U. S. 407, as to the Secretary of State and funds in that department: *United States* v. *Holliday*, 3 Wall. 407, as to the Secretary of the Interior: *Merritt* v. *Welsh*, 104 U. S. 694; *Morrill* v. *Jones*, 106 U. S. 466, as to the Secretary of the Treasury.

The application before this court is not an attempted proceeding against the United States. This court is not asked to control or direct or interfere with the executive in the performance of any duty imposed by the Constitution or the laws. It is not asked to send its process to any of the officers or agents of the executive. It is asked for a judicial writ to be directed to the District Court of Alaska, in accordance with the special authority given by the laws of the United States. The only question now before the court is, shall this writ issue? The right of the executive to deal with persons and property can never, under the Constitution of the United States, be a political question. *Little* v. *Barreme*, 2 Cranch, 170.

Without the clear authority of a law of Congress, the executive can never, by determining a so-called political question, or by construing an act of Congress or a treaty, conclude the rights of persons or property, under the protection of the Constitution and laws of the United States, or conclude the courts of the United States, in a determination of these rights. *Little* v. *Barreme*, *ubi sup.*; *United States* v. *Rauscher*, 119 U. S. 407, 418.

VI. No action heretofore taken by the United States government amounts to an assertion of any sovereignty in the United States, which would give jurisdiction to its courts over any portion of the Behring Sea or the wild animals therein, beyond a marine league from any shores of the United States.

Not only does the diplomatic correspondence of the United States fail to disclose such an assertion of sovereignty or definiteness of position with respect to this question, as would preclude the court from giving to it original examination, but the right of the court to examine and the propriety of its determining this question has been expressly acknowledged and definitely preferred by that very department of the government.

VII. It is earnestly insisted that the allegation in the diplomatic correspondence of the United States of the admission by Great Britain of any exclusive jurisdiction of Russia in Behring Sea cannot, in the absence of an act of Congress or a treaty, affect the legality of this seizure and condemnation, even if the allegation were well founded. The allegation and contention of the United States in this respect are, however, without foundation.

The contention, advanced for the first time by the United States in this controversy, after an acquiescence of more than sixty-five years in the world's construction of the treaties of 1824 and 1825, that the phrase "Pacific Ocean," as used in those treaties, was not intended to include, and did not include the body of water which is now known as the Behring Sea, because the words "Behring Sea" were not used in either treaty, is absolutely without foundation; and yet the amazing concession is made by the United States that, "if Great Britain can maintain her position that the Behring Sea at the time of the treaties with Russia of 1824 and 1825, was included in the Pacific Ocean, the government of the United States has no well grounded complaint against her."

It is said that Great Britain herself enjoys an exclusive fishery for pearls in Australian waters under a municipal law providing for its protection, but until that law is sought to be enforced against the vessels of some friendly nation in

time of peace, it certainly cannot be cited as authority for the subject in hand; and even if Great Britain should resort to force against foreign nations in support of its claim, such a circumstance would not justify the legality of the present seizure, for courts do not administer laws in that way. They administer justice as based upon recognized rules of law. But the fact is that the special act in question, by its own terms, expressly limits its provisions to British ships, and boats attached to British ships.

VIII. The defect of jurisdiction in the District Court was not waived, and no act of the parties could cure such defect or confer jurisdiction.

The judicial power of the United States is limited not alone with reference to the States of the Union, but also with reference to the nations of the earth; not only by the Constitution of the United States, but by the principles of the law of nations, recognized by our Constitution and laws. In the words of Chief Justice Marshall: "The law of nations is the law of all tribunals in the society of nations."

We deny that the judicial power of the United States extends to the trial and condemnation of a British vessel, wrongfully seized in time of peace on the high seas, fifty-nine miles from land.

We deny that the forcible bringing in to the limits of a district of the United States of such vessel, so unlawfully seized, can enlarge or extend the judicial power of the United States.

We deny that any act of the United States' executive officers, from the President to the lowest, — that any act of the officers of a court of the United States, or that any act of the court itself, could make the judicial power of the United States extend to such a case.

The proceedings of the inferior court of admiralty are before this court for a single purpose — to see if that court has proceeded without jurisdiction or in excess of jurisdiction. The test is well stated by Mr. Justice Miller in the case of *Cooper v. Reynolds*, 10 Wall. 308. The court will examine the facts of this case as they appear on the face of the proceedings, for there are no presumptions in favor of the jurisdic-

tion of the courts of the United States. *Ex parte Smith*, 94 U. S. 455, 456.

The District Court of Alaska never had lawful jurisdiction of the vessel. No instance court of admiralty of the United States can gain any jurisdiction of a foreign vessel by a seizure which the United States, the sovereignty that created the court, could not authorize, and which, as a matter of fact, was not authorized any more by the laws of the United States than by the law of nations.

It is confidently submitted that in the case of this foreign vessel so seized, the trespass is so connected with the subsequent seizure by the civil authority under process of the District Court, as to annul the proceedings of that court against the vessel. "A seizure is a single act, and not a continuous fact. Possession, which follows seizure, is continuous." *Thompson* v. *Whitman*, 18 Wall. 451, 471.

While it is admitted that the vessel was actually in the port of Sitka when the libel was filed and the monition served, it is confidently denied that she was within the jurisdiction of the court of Alaska. In such a case appearance and pleading to the merits cannot confer jurisdiction. *Rhode Island* v. *Massachusetts*, 12 Pet. 657. And objections to the jurisdiction when they go to the subject matter and not to the form merely of its presentation or to the character of the relief prayed are not waived because they were not made in the lower court. *Boom Co.* v. *Patterson*, 98 U. S. 403; *Ex parte Bradley*, 7 Wall. 364.

IX. There is no provision for the review of the Alaska admiralty court except by the writ of prohibition.

It has repeatedly been held by this court that there can be no review by appeal here unless it is expressly given by an act of Congress, and that statutes providing for such appeal cannot be enlarged by implication. *Crawford* v. *Points, Assignee*, 13 How. 11; *The Lucy*, 8 Wall. 307; *Butterfield* v. *Usher*, 91 U. S. 246.

So that no greater right of appeal can be construed out of this act than its terms directly express, and whatever may have been formerly held, it is now the established doctrine of

this court that the right of appeal must be expressly given or it does not exist.

We submit, as the result of a careful examination of all the statutes bearing on the subject, that the clear and necessary construction of the final clause of section 7, of the Alaska act, is that the appeals shall lie, as in other cases they are allowed from the decrees and final judgments of District Courts, and of District Courts acting as Circuit Courts; and while this does not give a large and extensive right of appeal, the right of appeal direct from the District Court of Alaska in admiralty cases, other than prize, to this court has been omitted and denied.

In submitting to this august tribunal a case involving the legality, under the laws of our own country, of an act of the executive, counsel cannot refrain from quoting the language in which this court has announced the fundamental principle which must govern its decision in this aspect of the case.

"No man in this country," says this court, in *United States v. Lee*, 106 U. S. 196, 220, "is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it. It is the only supreme power in our system of government; and every man, who, by accepting office, participates in its functions, is only the more strongly bound to submit to the supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives."

Unless the laws of the United States admit of no other construction, it is confidently submitted that they will not be held to justify a seizure and condemnation that violate all the principles of international law which the United States have steadily maintained against all the nations of the earth, from the beginning of their existence.

*Mr. Attorney General* and *Mr. Solicitor General* opposing.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

By section one of the act of Congress of May 17, 1884, entitled "An act providing a civil government for Alaska," (23 Stat. 24, c. 53,) it is provided "that the territory ceded to the United States by Russia by the treaty of March thirtieth, eighteen hundred and sixty-seven, and known as Alaska, shall constitute a civil and judicial district, the government of which shall be organized and administered as hereinafter provided. The temporary seat of government of said district is hereby established at Sitka."

The first part of section three is as follows:

"That there shall be, and hereby is, established a District Court for said district, with the civil and criminal jurisdiction of District Courts of the United States, and the civil and criminal jurisdiction of District Courts of the United States exercising the jurisdiction of Circuit Courts, and such other jurisdiction, not inconsistent with this act, as may be established by law."

Under this section the court thus established acquired all the admiralty jurisdiction within the District of Alaska belonging to District Courts of the United States. *The City of Panama*, 101 U. S. 453.

Section 688, Revised Statutes, provides: "The Supreme Court shall have power to issue writs of prohibition to the District Courts when proceeding as courts of admiralty and maritime jurisdiction." And although we were of opinion when the application for the rule was made, and subsequently held, (*McAllister* v. *United States*, 141 U. S. 174,) that the District Court for Alaska was not one of the courts mentioned in Article III of the Constitution, declaring that the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as Congress shall from time to time establish, we nevertheless concluded that where the District Court of Alaska was acting as a District Court of the United States and, as such, proceeding in admiralty, it came within that section, and this court had power to issue the writ of prohibition to that court in a proper case; and as the questions involved could be, in our judgment, more satisfactorily presented upon a return, we granted the rule. *In re Cooper, Petitioner*, 138 U. S. 404.

The writ thus provided for by section 688 is the common law writ, which lies to a court of admiralty only when that court is acting in excess of, or is taking cognizance of matters not arising within, its jurisdiction. Its office is to prevent an unlawful assumption of jurisdiction, and not to correct mere errors and irregularities. *Ex parte Gordon*, 104 U. S. 515; *Ex parte Ferry Company*, 104 U. S. 519.

Whether the granting or refusal of the writ is discretionary or demandable of right has been much debated.

As remarked by Mr. Justice Gray in *Smith* v. *Whitney*, 116 U. S. 167, 173, it may be said to be discretionary, "where there is another legal remedy, by appeal or otherwise, or where the question of the jurisdiction of the court whose action is sought to be prohibited is doubtful, or depends on facts which are not made matter of record, or where a stranger, as he may in England, applies for the writ of prohibition. But where that court has clearly no jurisdiction of the suit or prosecution instituted before it, and the defendant therein has objected to its jurisdiction at the outset, and has no other remedy, he is entitled to a writ of prohibition as a matter of right; and a refusal to grant it, where all the proceedings appear of record, may be reviewed on error."

But it is clear upon reason and authority that where the case has gone to sentence and the want of jurisdiction does not appear upon the face of the proceedings, the granting of the writ, which even if of right is not of course, is not obligatory upon the court, and the party applying may be precluded by acquiescence from obtaining it.

Section fourteen of the act of May 17, 1884, provided: "That the provisions of chapter three, title twenty-three, of the Revised Statutes of the United States, relating to the unorganized Territory of Alaska, shall remain in full force, except as herein specially otherwise provided." Chapter 3 of Title XXIII of the Revised Statutes is entitled: "Provisions relating to the unorganized Territory of Alaska," and begins with section 1954, which is as follows: "The laws of the United States relating to customs, commerce, and navigation are extended to and over all the mainland, islands and waters

of the territory ceded to the United States by the Emperor of Russia by treaty concluded at Washington on the thirtieth day of March, anno Domini, eighteen hundred and sixty-seven, so far as the same may be applicable thereto."

By the treaty of March 30, 1867, (15 Stat. 539,) the Emperor of Russia ceded to the United States "all the territory and dominion now possessed by his said majesty on the continent of America and in the adjacent islands, the same being contained within the geographical limits herein set forth, to wit: The eastern limit is the line of demarcation between the Russian and the British possessions in North America, as established by the convention between Russia and Great Britain of February 28–16, 1825, described in articles III and IV of said convention, in the following terms: (Here follows the description of the eastern limit as given in the convention referred to.)

"The western limit within which the territories and dominion conveyed are contained, passes through a point in Behring's straits on the parallel of sixty-five degrees thirty minutes north latitude, at its intersection by the meridian which passes midway between the islands of Krusenstern or Ignalook, and the island of Ratmanoff, or Noonarbook, and proceeds due north, without limitation, into the same Frozen Ocean. The same western limit, beginning at the same initial point, proceeds thence in a course nearly southwest through Behring's straits and Behring's Sea, so as to pass midway between the northwest point of the island of St. Lawrence and the southeast point of Cape Choukotski, to the meridian of one hundred and seventy-two west longitude; thence, from the intersection of that meridian, in a southwesterly direction, so as to pass midway between the island of Attou and the Copper Island of the Kormandorski couplet or group in the North Pacific Ocean, to the meridian of one hundred and ninety-three degrees west longitude, so as to include in the territory conveyed the whole of the Aleutian Islands east of that meridian."

Section 1956, (Tit. XXIII, c. 3,) Revised Statutes, reads thus: "No person shall kill any otter, mink, marten, sable or fur

seal, or other fur-bearing animal within the limits of Alaska Territory, or in the waters thereof; and every person guilty thereof shall, for each offence, be fined not less than two hundred nor more than one thousand dollars, or imprisoned not more than six months, or both; and all vessels, their tackle, apparel, furniture and cargo, found engaged in violation of this section shall be forfeited; but the Secretary of the Treasury shall have power to authorize the killing of any such mink, marten, sable or other fur-bearing animal, except fur seals, under such regulation as he may prescribe; and it shall be the duty of the Secretary to prevent the killing of any fur seal, and to provide for the execution of the provisions of this section until it is otherwise provided by law; nor shall he grant any special privileges under this section."

Section 3 of the act of March 2, 1889, (25 Stat. 1009, c. 415,) is as follows:

"That section nineteen hundred and fifty-six of the Revised Statutes of the United States is hereby declared to include and to apply to all the dominion of the United States in the waters of Behring Sea; and it shall be the duty of the President, at a timely season in each year, to issue his proclamation and cause the same to be published for one month in at least one newspaper if any such there be published at each United States port of entry on the Pacific coast, warning all persons against entering said waters for the purpose of violating the provisions of said section; and he shall also cause one or more vessels of the United States to diligently cruise said waters and arrest all persons, and seize all vessels found to be, or to have been, engaged in any violation of the laws of the United States therein."

Section 734, Revised Statutes, is as follows:

"Proceedings on seizures, for forfeiture under any law of the United States, made on the high seas, may be prosecuted in any district into which the property so seized is brought and proceedings instituted. Proceedings on such seizures made within any district shall be prosecuted in the district where the seizure is made, except in cases where it is otherwise provided."

Under section 563, the District Courts have exclusive juris-diction over forfeitures and seizures on navigable waters, and on land and on waters not within admiralty and maritime jurisdiction. The District Court of Alaska had jurisdiction in admiralty, therefore, to forfeit vessels for violation of sec-tion 1956 on any of the navigable waters within the dominion of the United States, acquired by the treaty of March 30, 1867.

The contention on behalf of the petitioner is that it appears from the record that the schooner Sayward was forcibly arrested by the United States on the high seas fifty-nine miles from shore, and forcibly taken within the limits of the Dis-trict of Alaska, and subjected to condemnation and forfeiture in the Alaska District Court for the violation of section 1956 of the Revised Statutes of the United States, by its master and seamen and seal hunters under him, in killing fur seal at the place of seizure; and that the court was absolutely desti-tute of jurisdiction, because by the recognized principles of international law the territorial waters of each nation and its municipal jurisdiction on the high seas are limited to three miles or a marine league from shore. And it is insisted that when Congress in section 1956 speaks of "Alaska Territory" and "the waters thereof," it could only mean, so far as the sea was concerned, three miles or a marine league from the shore of the continent, or from the shores of one of the adja-cent islands, and that the act of March 2, 1889, does not in any way enlarge the effect of section 1956, because "the dominion of the United States in the waters of Behring Sea" is limited by the law of nations to the distance from the shore above mentioned.

If we assume that the record shows the locality of the al-leged offence and seizure as stated, it also shows that officers of the United States, acting under the orders of their govern-ment, seized this vessel engaged in catching seal and took her into the nearest port; and that the law officers of the govern-ment libelled her and proceeded against her for the violation of the laws of the United States, in the District Court, result-ing in her condemnation.

How did it happen that the officers received such orders? It must be admitted that they were given in the assertion on the part of this government of territorial jurisdiction over Behring Sea to an extent exceeding fifty-nine miles from the shores of Alaska; that this territorial jurisdiction, in the enforcement of the laws protecting seal fisheries, was asserted by actual seizures during the seasons of 1886, 1887 and 1889, of a number of British vessels; that the government persistently maintains that such jurisdiction belongs to it, based not only on the peculiar nature of the seal fisheries and the property of the government in them, but also upon the position that this jurisdiction was asserted by Russia for more than ninety years, and by that government transferred to the United States; and that negotiations are pending upon the subject.

While it is conceded that in matters committed by the Constitution and laws of the United States either to Congress or to the executive, or to both, courts are clearly bound by the action of Congress or the executive, or both, within the limits of the authority conferred by the Constitution and laws, yet it is insisted that Congress and the executive, constituting the political departments of the government, having before them the question "of the extent of the dominion of the United States in the Behring Sea," which they could doubtless by conjoint action determine so as to bind the courts, have chosen neither to determine that extent nor to make any provision of law by which it is devolved on the executive to determine it, and that, therefore, it is the duty of this court in the case at bar, involving the legality of the seizure and condemnation of a foreign vessel alleged to be in violation of the law of nations and without warrant of any law of the United States to determine the question.

Assuming that the executive alone can speak so as to bind our courts in respect of the sovereignty of foreign territory, the changes in foreign governments, the existence of civil war in foreign countries, and the character of a foreign minister, counsel nevertheless confidently assert "that without the clear authority of the law of Congress, the executive can never, by determining a so-called political question or by construing an

act of Congress or a treaty, conclude the rights of persons or property under the protection of the Constitution and laws of the United States, or conclude the courts of the United States in a determination of these rights;" and *Little* v. *Barreme*, 2 Cranch, 170, 177, and *United States* v. *Rauscher*, 119 U. S. 407, 418, are cited.

In *Little* v. *Barreme*, the legality of the seizure of a French vessel, coming from a French port, on the high seas, by the orders of the President, purporting to be issued under an act of Congress authorizing the seizure of vessels bound to a French port, but not those coming from a French port, was involved, and Mr. Chief Justice Marshall, delivering the opinion of the court, said:

"It is by no means clear that the President of the United States, whose high duty it is to 'take care that the laws be faithfully executed,' and who is commander-in-chief of the armies and navies of the United States, might not, without any special authority for that purpose, in the then existing state of things, have empowered the officers commanding the armed vessels of the United States, to seize and send into port for adjudication *American* vessels which were forfeited by being engaged in this illicit commerce. But when it is observed that the general clause of this first section of the act, which declares 'that such vessels may be seized, and may be prosecuted in any District or Circuit Court, which shall be holden within or for the district where the seizure shall be made,' obviously contemplates a seizure within the United States; and that the fifth section gives a special authority to seize on the high seas, and limits that authority to the seizure of vessels bound or sailing *to* a French port, the legislature seem to have prescribed that the manner in which this law shall be carried into execution, was to exclude a seizure of any vessel not bound *to* a French port. Of consequence, however strong the circumstances might be, which induced Captain Little to suspect the Flying-Fish to be an American vessel, they could not excuse the detention of her, since he would not have been authorized to detain her had she been really American."

And he states the conclusion of the court to be : "That the instructions cannot change the nature of the transaction, nor legalize an act which, without those instructions, would have been a plain trespass."

In *United States* v. *Rauscher*, it appeared that the United States asserted the right under the law of nations to try persons extradited from Great Britain for offences other than those for which they were extradited, while Great Britain insisted that no such right existed under the law of nations or was conceded by treaty. The question was, whether, under the treaty with Great Britain, a man extradited from England to this country on the charge of murder could be tried here for another offence, and it was held that he could not be. And Mr. Justice Miller, delivering the opinion of the court quoted from the *Head Money Cases*, 112 U. S. 580, 598, the following language as determinative of the principle upon which the court proceeded : "A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress. But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country. An illustration of this character is found in treaties which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance, when the individuals concerned are aliens. The Constitution of the United States places such provisions as these in the same category as other laws of Congress, by its declaration that 'this Constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the

supreme law of the land.' A treaty, then, is a law of the land, as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute."

As to the third section of the act of March 3, 1889, it is argued that Congress intentionally declined to determine the extent of the dominion of the United States in the Behring Sea, as shown by its action during the steps attending the passage of the bill. That section, as the bill passed the House, contained the words: "All the waters of Behring Sea in Alaska embraced within the boundary lines mentioned and described in the treaty with Russia, dated March 30, A.D. 1867, by which the Territory of Alaska was ceded to the United States." But as finally enacted these words were omitted, and the expression "All the dominion of the United States in the waters of Behring Sea" substituted. Section two of the bill as originally introduced in the Senate contained the words in question, but they were omitted in a substitute adopted by the Senate, and added by the House, by way of amendment, as section three. To this amendment the Senate disagreed, and the section, as it now stands, was the result of a conference between the two houses. If reference could be properly made to such matters, (for the act, as finally approved, must speak for itself,) still we do not concur in the view that it follows that Congress thereby expressly invited the judicial branch of the government to determine what are "the limits of Alaska Territory and the waters thereof," and what is "the dominion of the United States in the waters of Behring Sea," and think, on the contrary, that there is much force in the position that, whatever the reason for the conservative course pursued by the Senate, the enactment of this section, with full knowledge of the executive action already had and of the diplomatic situation, justified the President in the conclusion that it was his duty, under section three, to adhere to the construction already insisted upon as to the extent of the dominion of the United States, and to continue to act accordingly.

If this be so, the application calls upon the court, while negotiations are pending, to decide whether the government is right or wrong, and to review the action of the political departments upon the question, contrary to the settled law in that regard. *Foster* v. *Neilson*, 2 Pet. 253; *Williams* v. *Suffolk Ins. Company*, 3 Sumner, 270; *S. C.* on certificate of division, 13 Pet. 415; *Luther* v. *Borden*, 7 How. 1; *Georgia* v. *Stanton*, 6 Wall. 50; *Jones* v. *United States*, 137 U. S. 202; *Nabob of Carnatic* v. *East India Company*, 1 Ves. Jr. 371; *S. C.* 2 Ves. Jr. 56; *Barclay* v. *Russell*, 3 Ves. Jr. 424; *Penn* v. *Baltimore*, 1 Ves. Sr. 444.

In this case, Her Britannic Majesty's Attorney General of Canada has presented, with the knowledge and approval of the Imperial government of Great Britain, a suggestion on behalf of the claimant. He represents no property interest in the vessel, as is sometimes done by consuls, but only a public political interest. We are not insensible to the courtesy implied in the willingness thus manifested that this court should proceed to a decision on the main question argued for the petitioner; nor do we permit ourselves to doubt that under such circumstances the decision would receive all the consideration that the utmost good faith would require; but it is very clear that, presented as a political question merely, it would not fall within our province to determine it. We allude to this in passing, but not at all with the intention of indicating that the suggestion itself diminishes the private rights of the claimant in any degree.

We are not to be understood, however, as underrating the weight of the argument that in a case involving private rights, the court may be obliged, if those rights are dependent upon the construction of acts of Congress or of a treaty, and the case turns upon a question, public in its nature, which has not been determined by the political departments in the form of a law specifically settling it, or authorizing the executive to do so, to render judgment, " since we have no more right to decline the jurisdiction which is given than to usurp that which is not given."

But we need not go farther in this direction, as our decision

rests upon narrower grounds, and we have been led into these observations because, where an application is made to stay the enforcement of a decree three years after its rendition, and after the pendency of an appeal therefrom for the same length of time, (an appeal being allowable, as we shall presently see,) we do not regard the court as constrained to intervene in this way unless, perhaps, upon an irresistible case and adequate reason shown for the delay; and particularly not where such intervention involves the definition of the line of demarcation between coördinate departments of the government and the determination of public questions, action in reference to which is appropriately confided to other departments than the judicial.

In what has been said, we have assumed that it appears from the record, properly examinable by us, that the alleged offence was committed more than a marine league from shore; and we now come to consider whether this is the fact. And in doing this, with the view of ascertaining whether the claimant is entitled to be relieved of the payment of $7289.50, which is the amount of the stipulation, the record must be treated as in any other case of private rights.

As already seen, prohibition will not go after sentence unless want of jurisdiction appears on the face of the proceedings. But it is contended that the face of the proceedings in a case like the present one embraces the evidence. We think, however, that there is a distinction on principle, and sustained by authority, between what is open on prohibition applied for before sentence and what afterwards. Prohibition stays what is about to be done, but which ought not to be done without it. Before judgment, if the court below persist in going on when it should not, the court above can examine, not simply the process and pleadings technically of record, but the facts in evidence upon which action is being taken.

In *Ex parte Christy*, 3 How. 292, 308, which was an application for a writ of prohibition against the District Court of Louisiana sitting as a court in bankruptcy, Mr. Justice Story said: "So far as respects these allegations of facts, not so found in the proceedings of the District Court, we are not

upon the present occasion at liberty to entertain any consideration thereof for the purpose of examination or decision, as it would be an exercise of original jurisdiction on the part of this court not confided to us by law. The application for the prohibition is made upon the ground that the District Court has transcended its jurisdiction in entertaining those proceedings; and whether it has or not must depend, not upon the facts stated *dehors* the record, but upon those stated in the record upon which the District Court was called to act, and by which alone it could regulate its judgment." And this language was repeated and approved in *Ex parte Easton*, 95 U. S. 68, where prohibition was asked against a District Court in admiralty. These were cases where the application was before sentence, and they show that the court may consider the evidence as well as the other proceedings in the court sought to be restrained. But after final judgment and the lapse of the term, for the Superior Court to enter upon an examination of the evidence upon a suggested defect in the jurisdiction, that is, a defect not apparent upon the face of the record proper, would be for it to rehear the case and direct the court below not to carry its own judgment into effect, for defect of power to try the particular issue rather than of jurisdiction over the cause. What the court below could not then do, or omit to do, the court above ought not ordinarily to undertake to compel it to do or to omit.

In *United States* v. *Peters*, 3 Dall. 121, the Cassius, the vessel seized, was under commission by the French government, and was libelled in the District Court of Pennsylvania on account of the seizure of a schooner belonging to libellants upon the high seas, and the libel showed that the schooner had been taken into Port de Paix, (in the dominions of the French Republic,) which justified the presumption that she was carried there for legal adjudication, and it appeared from the suggestion for the prohibition that such was the fact, and that therefore the jurisdiction for the adjudication of the libel was in a French and not in an American admiralty court. That was an application before sentence and the court could look into the evidence before the District Court if necessary,

though it appears to us that the want of jurisdiction was evident on the face of the libel; and prohibition was accordingly issued.

In *Ex parte Phœnix Insurance Co.*, 118 U. S. 610, 626, it was held that the District Court of the United States in admiralty has no jurisdiction of a petition by the owner of a steam vessel for the trial of the question of his liability for damages caused to buildings on land by fire alleged to have been negligently communicated to them by the vessel through sparks proceeding from her smokestack, and for the limitation of such liability, if existing, under §§ 4283 and 4284, Revised Statutes. And Mr. Justice Blatchford, delivering the opinion of the court, said, after citing *Ex parte Easton*, 95 U. S. 68, and *Ex parte Gordon*, 104 U. S. 515: "But in the present case the District Court is called upon by the petition of the owner of the vessel to first determine the question of any liability, when it has no jurisdiction of the cause of action, and then to determine whether the statute covers the case. The case is clearly one for a writ of prohibition, as the want of jurisdiction appears on the face of the proceedings. *United States* v. *Peters*, 3 Dall. 121."

The cases cited in the text-books, High on Extr. Rem., 606; Shortt on Informations, 442, 448, sustain the general view that the evidence is not to be resorted to after sentence. The principle has no application to courts where the proceedings do not show the matter in any formal way, and such are the decisions in England in reference to county and mayor's courts.

United States District Courts sitting in admiralty are courts of superior jurisdiction and every intendment is made in favor of their decrees, so that where it appears that the court has jurisdiction of the subject matter, and that the defendant was duly served with process or voluntarily appeared and made defence, the decree is not open to attack collaterally. *Miller* v. *United States*, 11 Wall. 268; *McCormick* v. *Sullivant*, 10 Wheat. 192; *Des Moines Nav. Company* v. *Homestead Company*, 123 U. S. 552; *Cuddy, Petitioner*, 131 U. S. 280.

By section 750, Revised Statutes, it is provided: "In equity

and admiralty causes only the process, pleadings and decree, and such orders and memorandums as may be necessary to show the jurisdiction of the court and regularity of the proceedings, shall be entered upon the final record."

Section 698 is as follows:

"Upon the appeal of any cause in equity, or of admiralty and maritime jurisdiction, or of prize or no prize, a transcript of the record, as directed by law to be made, and copies of the proofs, and of such entries and papers on file as may be necessary on the hearing of the appeal, shall be transmitted to the Supreme Court; *Provided*, That either the court below or the Supreme Court may order any original document or other evidence to be sent up, in addition to the copy of the record, or in lieu of a copy of a part thereof."

In this section the distinction is recognized between that which constitutes the final record and that which may be made part of the record for the purposes of appeal. On appeal all questions properly preserved are open to determination, while on prohibition the inquiry is confined to the matter of jurisdiction, so that it seems to follow that, unless under very extraordinary circumstances, the record proper should only be looked into in the latter class of cases.

If the record thus made constitutes the face of the proceedings here, the alleged want of jurisdiction does not appear therefrom.

The libel alleges that the seizure was made "within the limits of Alaska Territory and in the waters thereof, and within the civil and judicial District of Alaska, to wit, within the waters of that portion of Behring Sea belonging to the United States and said district, on waters navigable from the sea by vessels of ten or more tons burden." As it is admitted that the United States lawfully exercises jurisdiction to the extent of three miles from shore over the waters of Behring Sea, the allegation of seizure within the jurisdiction is s in-cient. The libel further avers that the vessel and her captain, officers and crew, "were then and there found engaged in killing fur seals within the limits of Alaska Territory, and in the said waters thereof, in violation of section 1956 of the

Revised Statutes of the United States." Of course, these are the waters over which the United States lawfully exercises jurisdiction, and upon the face of the libel the court had jurisdiction of the forfeiture and of the offence. The master raised no question of jurisdiction in filing his claim, and the demurrer having been overruled, the answer denied that the seizure was made within the waters described or that the vessel, captain, officers or crew were found engaged in killing fur seal within the limits of Alaska Territory or in the waters thereof, or that they were then and there violating any law of the United States. Trial having been had the court found that "on the 9th day of July, 1887, and theretofore, the master and crew of the defendant vessel were engaged in killing and did kill fur seals in that portion of Behring Sea ceded by Russia to the United States by the treaty of March, 1867, and within the waters of Alaska, in violation of section 1956 of the Revised Statutes of the United States." This was a finding of the commission of the offence within the jurisdiction stated in the libel.

As already seen, the first section of the act of May 17, 1884, provided, "that the territory ceded to the United States by Russia by the treaty of March thirtieth, eighteen hundred and sixty-seven, and known as Alaska," should constitute a civil and judicial district. And by section 1954 of the Revised Statutes, the laws of the United States relating to customs, commerce and navigation were extended "to and over all the main-land, islands and waters of the territory ceded to the United States by the Emperor of Russia by treaty concluded at Washington on the thirtieth day of March, anno Domini eighteen hundred and sixty-seven." The finding refers similarly to that portion of Behring Sea ceded by Russia, and states that the killing was "within the waters of Alaska." The second and third findings were that the vessel, her furniture, apparel, tackle, cargo and 477 fur-seal skins, were seized in said waters, that is to say, in the waters of Alaska, by the commanding officer of the United States revenue-cutter Rush, then and there engaged in the revenue marine service of the United States, who was duly commis-

sioned by the President of the United States, and made such seizure under the direction and by the authority of the Treasury Department.

Upon the face of the libel and findings, if the jurisdiction did not extend beyond three miles from the shore, the legal inference is that the offence and seizure were within that limit. *Hudson* v. *Guestier*, 6 Cranch, 281 ; *The Rio Grande*, 23 Wall. 458. The court had power to inquire into the fact upon which jurisdiction depended and its maintenance of jurisdiction involved the conclusion necessary to sustain it.

If, therefore, the findings of fact are properly part of the face of the proceedings, the want of jurisdiction not only does not appear, but the contrary. The petitioner asked no finding of fact by the court as to the exact locality, but after the findings and conclusion were made and filed, moved in arrest, assigning, among other grounds, " that from the evidence produced on the part of the United States it appears that this court has no jurisdiction over the subject matter of this cause." But this motion was not equivalent to a plea in abatement, nor to a declinatory allegation in the nature of a plea to the jurisdiction, nor to a motion for a rehearing. By the demurrer and answer the defendant had submitted to the jurisdiction, and whatever might be his rights upon appeal, the interposition of this motion did not make that a part of the face of the proceedings, which would not have been so without it.

Passing from this, however, what is the attitude of the case as to the findings? Is this court bound by them or not? If so, no reference to the evidence would be admissible.

The latter part of section 7 of the act of May 17, 1884, 23 Stat. 24, 26, is as follows : " Writs of error in criminal cases shall issue to the said District Court from the United States Circuit Court for the District of Oregon in the cases provided in chapter one hundred and seventy-six of the laws of eightee hundred and seventy-nine ; and the jurisdiction thereby conferred upon Circuit Courts is hereby given to the Circuit Court of Oregon. And the final judgments or decrees of said Circuit and District Court may be reviewed by the Supreme Court of the United States as in other cases." We

are of opinion that the word Circuit as here used refers to the Circuit Court of Oregon, and, for the purposes of the matter in hand, the clause may be read: "And the final judgments or decrees of said District Court of Alaska may be reviewed by the Supreme Court of the United States as in other cases."

Under sections 690, 691, 692, 695 and 699, of the Revised Statutes, this court has appellate jurisdiction to reëxamine the final judgments of any Circuit Court, or of any District Court acting as a Circuit Court, in civil actions, where the matter in dispute, exclusive of costs, exceeds the sum or value of $5000; all final decrees of any Circuit Court, or of any District Court acting as a Circuit Court, in cases of equity and of admiralty and maritime jurisdiction, within the same limit of amount involved; all final decrees of any District Court in prize causes; all final judgments at law and final decrees in equity of any Circuit Court or of any District Court acting as a Circuit Court, in any case touching patent rights or copyrights; in any civil action brought by the United States for the enforcement of any revenue law thereof; in actions against revenue officers; in cases brought on account of deprivation of rights of citizens or of rights under the Constitution; and in suits for injuries by conspirators against civil rights. Under section 701 this court may affirm, modify or reverse any judgment, decree or order of a Circuit Court, or District Court acting as a Circuit Court, or of a District Court in prize causes, lawfully brought before it for review, or may direct such judgment, decree or order to be rendered, or such further proceedings to be had by the inferior court as the justice of the case may require. And it is argued that the words " as in other cases," in section *i* of the act of 1884 can mean nothing else than other cases of appeals from District Courts and District Courts acting as Circuit Courts; and that the right of appeal from the decrees of District Courts is confined to prize causes under section 695.

It is said that if there could be such a thing as an appeal from the District Court of Alaska in an ordinary admiralty case direct to this court, this court would be obliged to try the case *de novo;* that the District Court of Alaska, sitting as an

admiralty court, would supply and take the place of a Circuit Court in admiralty sitting in appeal, although all the statutes authorizing District Courts to exercise the functions of Circuit Courts expressly exclude the power of appeal; that the only foundation of a right of appeal from the Alaska court, based upon this right to exercise the jurisdiction of a Circuit Court, is section 692 of the Revised Statutes, and that only extends to the final decrees of such District Court when exercising the jurisdiction of a Circuit Court, while the exercise of admiralty and maritime jurisdiction by the District Court for Alaska was, by the act creating it and the Revised Statutes, the exercise of purely District Court jurisdiction as such; nor could the Alaska court be supposed to have acted in the exercise of both jurisdictions, as the only admiralty and maritime jurisdiction which belongs to the Circuit Courts is appellate.

But the District Court of Alaska is not alone a District Court of the United States, and a District Court exercising Circuit Court powers; it is also a court of general law and equity jurisdiction. If the contention of petitioner were correct, any power of review in this court over judgments and decrees of the Alaska court in law and equity, except when entered as a Circuit Court, would be excluded. We do not think it was the intention of Congress to give such finality to its judgments and decrees.

It seems to us that the words " as in other cases " mean, as in similar cases from other courts; and we concur in the construction contended for on the part of the respondent, that the meaning of the provision is, that this court may review the final judgments or decrees of the District Court of Alaska as in cases of the same kind from other courts.

The act of February 16, 1875, (18 Stat. 315,) provides that Circuit Courts of the United States in deciding causes of admiralty or maritime jurisdiction on the instance side of the court, shall find the facts and the conclusions of law upon which it renders its judgments or decrees, and shall state the facts and conclusions of law separately. And the review of the judgments or decrees entered upon such findings, by this court, upon appeal, is " limited to a determination of the ques-

tions of law arising upon the record, and to such rulings of the Circuit Court, excepted to at the time, as may be presented by a bill of exceptions prepared as in actions at law."

In *Durousseau* v. *United States*, 6 Cranch, 307, 315, the effect of section ten of the Judiciary Act of 1789, (1 Stat. 73, 77,) was under consideration. The section provided "that the District Court in Kentucky District" should, in addition to the ordinary jurisdiction of a District Court, "have jurisdiction of all other causes, except of appeals and writs of error hereinafter made cognizable in a Circuit Court, and shall proceed therein in the same manner as a Circuit Court, and writs of error and appeals shall lie from decisions therein to the Supreme Court in the same causes, as from a Circuit Court to the Supreme Court, and under the same regulations."

It was argued that under this provision the writs of error and appeals provided were intended to lie only from cases in which the District Court acted as a Circuit Court. Mr. Chief Justice Marshall, delivering the opinion of the court, said:

"It would be difficult to conceive an intention in the legislature to discriminate between judgments rendered by the District Court of Kentucky, while exercising the powers of a District Court, and those rendered by the same court, while exercising circuit powers, when it is demonstrated that the legislature makes no distinction in the cases from their nature and character. Causes of which the District Courts have exclusive original jurisdiction are carried into the Circuit Courts, and then become the objects of the appellate jurisdiction of this court. It would be strange if, in a case where the powers of the two courts are united in one court, from whose judgments an appeal lies, causes, of which the District Courts have exclusive original jurisdiction, should be excepted from the operation of the appellate power. It would require plain words to establish this construction.

"The plain meaning of these words is, that wherever the District Court decides a cause which, if decided in a Circuit Court, either in an original suit, or on an appeal, would be subject to a writ of error from the Supreme Court, the judg-

ment of the District. Court shall, in like manner, be subject to a writ of error."

In our view, that decision is in point and is decisive. We hold that an appeal lay to this court from the decree in question, and, further, that the act of 1875 applies, and that, the District Court having found the facts, we should be limited, on appeal, in the consideration of the case, to the questions of law presented on the record.

Upon the face of the libel, the facts found and the final decree, the District Court clearly had jurisdiction. This petitioner had a remedy by appeal from that decree, which was inefficacious because of his neglect to have included in those findings the fact of the exact locality of the offence and seizure. Such being the case, the writ of prohibition prayed for should not issue, even if, under any circumstances, the court could consider the evidence taken below in determining whether a prohibition should issue after sentence.

*Rule discharged and prohibition denied.*

MR. JUSTICE FIELD dissented.