## UNITED STATES v. SILLIMAN.

### No. 9492.

Circuit Court of Appeals, Third Circuit.
Argued Feb. 2, 1948.
Decided March 25, 1948.

Rehearing Denied April 27, 1948.

See, also, D.C., 6 F.R.D. 262.

Sherwood E. Silliman, of New York City, and George W. C. McCarter, of Newark, N. J. (William H. Campbell, Jr., and Frederick M. P. Pearse, both of Newark, N. J., Reuben D. Silliman, pro se., and James V. McNamara, of Paterson, N. J., on the brief), for appellant.

Joseph W. Bishop, Jr., and James R. Wollenberg, both of Washington, D. C., (David L. Bazelon, Asst. Atty. Gen., Edgar H. Rossbach, U. S. Atty. for District of New Jersey, and Roger M. Yancey, Asst. U. S. Atty., both of Newark, N. J., Max Isenbergh, Sp. Asst. to Atty. Gen., and James L. Morrisson, of Washington, D. C., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

GOODRICH, Circuit Judge.

The United States brought an action against the defendant, Reuben D. Silliman, an attorney, to recover against him for his alleged participation in a plan to deceive officers of the United States so that they would return to another alleged participant in the plan, one Hackfeld, property which had been taken over from Hackfeld by the Alien Property Custodian in World War I. Hackfeld, a native German, had lived in Hawaii and made a fortune there. He was in Germany at the time the European war broke out in 1914 and upon the entrance of the United States into the war his American property was taken over by the Alien Property Custodian.[1] It was subsequently returned to him as a result, it is alleged, of the deceit practiced by lawyer and client upon officers of the United States as to Hackfeld's citizenship, residence, domicil, expatriation and other matters relevant to the return of alien enemy property.[2] Hackfeld has long since died and that part of his estate which was subject to administration in the United States was turned over to the Government at the conclusion of the ancillary administration in the State of New York. The present action is to recover from the defendant the amount equal to the difference in value, plus interest, of the property which was turned over to Hackfeld, less the amount received from the representative of the estate in New York Surrogate proceedings. The case was tried in the District Court for the District of New Jersey before a jury. A verdict was returned to the plaintiff for the full amount

---

[1] The statutory authority was the Trading with the Enemy Act, 40 Stat. 411 (1917), 50 U.S.C.A.Appendix, § 1 et seq.

[2] The original Trading with the Enemy Act made no provision for the return of the seized property but in 1920 Congress provided for the return of property belonging to American citizens and certain non-enemy aliens who had technically been enemies during the war. 41 Stat. 978 (1920), 50 U.S.C.A.Appendix, § 9(b) (1). Section 21 of the Trading with the Enemy Act, added on March 4, 1923 provided: "The claim of any naturalized American citizen under the provisions of this Act shall not be denied on the ground of any presumption of ex-

patriation which has arisen against him, under the second sentence of section 2 of the Act entitled 'An Act in reference to the expatriation of citizens and their protection abroad,' approved March 2, 1907, if he shall give satisfactory evidence to the President, or the court, as the case may be, of his uninterrupted loyalty to the United States during his absence, and that he has returned to the United States, or that he, although desiring to return, has been prevented from so returning by circumstances beyond his control." 42 Stat. 1516 (1923), 50 U.S.C.A.Appendix, § 21. This was the law at the time Hackfeld's claim was processed and under which the award was eventually made.

claimed[3] and a judgment was entered thereon. From this judgment the defendant appeals. The appeal presents a number of difficult questions which will be discussed separately and the skeleton statement of facts given will be enlarged where necessary to bring the legal point into focus.[4]

I. May the United States Sue for this Tort?

■■ The argument for the defense on this question is phrased in terms of jurisdiction of the United States courts. We do not think this method of approach is convincing nor does it make the point which the defendant really has in mind. If the United States has a cause of action the general statute [5] giving jurisdiction to District Courts of the United States is amply clear to show that the forum chosen is an appropriate one. The real argument the defendant makes is that whatever claim the United States might have is one under the False Claims Act of 1864.[6] If this is true the action cannot be maintained because the six year statute of limitations[7] has run since, under the defendant's theory, the tort, if any, was completed sometime in 1924.

■ We do not agree with the defendant's argument upon this point. The United States can sue those who commit tortious acts which result in pecuniary loss to the United States. Thus action may be brought for a trespass on Government owned land[8] or an injury to chattels owned by the United States.[9] We think this line of authorities clearly demonstrates the standing of the United States as plaintiff to recover pecuniary loss sustained through a tort recognized at the common law.[10] An action for harm resulting from false representations of material facts which influence one to do things resulting in his pecuniary loss has been recognized in the common law

---

[3] The parties stipulated at the trial what amount the jury should return as the verdict if they should decide for the plaintiff. Although the defendant makes a point concerning whether interest should be allowed on this type of claim any controversy thereon we think evaporates in view of the stipulation made at the trial.

[4] A description of previous proceedings which grew out of the Hackfeld claim up until the time of the return of the property to the Government is found in United States v. Rodiek, 2 Cir., 1941, 117 F.2d 588, aff'd by an equally divided court 1942, 315 U.S. 783, 62 S.Ct. 793, 86 L.Ed. 1190; see also United States v. Silliman, D.C.D.N.J.1946, 65 F.Supp. 665 (The instant case in the District Court).

[5] "The district courts shall have original jurisdiction as follows. (1) *United States as plaintiff; civil suits at common law or in equity*. First. Of all suits of a civil nature, at common law or in equity, brought by the United States, or by any officer thereof authorized by law to sue * * *." 28 U.S.C.A. § 41 (1). The Attorney General may institute suit in the name of the United States to recover for a wrong done to it or its property. Cf. United States v. California, 1947, 332 U.S. 19, 67 S.Ct. 1658; United States v. Standard Oil Co., 1947, 332 U.S. 301, 67 S.Ct. 1604; In re Cooper, 1892, 143 U.S. 472, 502, 503, 12 S.Ct. 453, 36 L.Ed. 232; Cotton v. United States, 1850, 11 How. 229, 13 L.Ed. 675.

[6] Rev.Stat. §§ 3490–3494 as amended 57 Stat. 608 (1943), 31 U.S.C.A. §§ 231–235. .

[7] "Every such suit shall be commenced within six years from the commission of the act, and not afterward." Rev. Stat. § 3494, 31 U.S.C.A. § 235.

[8] Cotton v. United States, 1850, 11 How. 229, 13 L.Ed. 675.

[9] United States v. Sayward, 1895, 160 U.S. 493, 16 S.Ct. 371, 40 L.Ed. 508; see also Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (suit against endorsers of forged Government checks); United States v. Wurts, 1938, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932; (recovery of erroneous tax refund); cf. United States v. Moscow-Idaho Seed Co., 9 Cir., 1937, 92 F.2d 170 (suit to recover damages for negligent injury to vehicle owned by United States). Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, did not abrogate the common law developed by the Federal courts in "federal fields". See Mr. Justice Jackson, concurring in D'Oench, Duhme & Co. v. Federal Deposit Ins. Co., 1942, 315 U.S. 447, 465, 472, 62 S. Ct. 676, 86 L.Ed. 956; Clark, State Law in the Federal Courts: The Brooding Omnipresence of *Erie v. Tompkins*, 55 Yale L.J. 267, 280, 295 (1946); Note, Interaction of National and State-Created Interests in Non-Diversity Fields, 47 Col.L.Rev. 629 (1947).

[10] "It would present a strange anomaly, indeed, if, having the power to make contracts and hold property as other per-

ever since the decision in Pasley v. Freeman.[11] It is well established, moreover, that in a suit in which the United States is sued for additional money allegedly due a claimant it can counterclaim and recover money already paid out if such payments were induced by fraudulent statements. Isenberg v. Biddle, 1941, 75 U.S.App.D.C. 100, 125 F.2d 741; cf. United States v. Rodiek, 2 Cir., 1941, 117 F.2d 588, aff'd by an equally divided court 1942, 315 U.S. 783, 62 S.Ct. 793, 86 L.Ed. 1190; Cummings v. Societe Suisse Pour Valeurs de Metaux, 1936, 66 App.D.C. 121, 85 F.2d 287. Implicit in these cases is the holding that such fraud gives rise to a cause of action for, unless it did, there would be no foundation on which to base a counterclaim. We think, therefore, the Government's standing as a plaintiff to recover a loss it sustains by conduct which amounts to the tort of deceit is pretty clear. Pooler v. United States, 1 Cir., 1904, 127 F. 519.

■ Nor do we think that the fact that The Congress passed a statute applicable to those who make false claims is to be interpreted as depriving the United States as plaintiff of remedies which it has for violation of a common law right. The False Claims Statute created a special measure of damages; it provided for recovery by an informer and supplied what was intended to be help to Government officers in getting redress from those who defrauded the United States. The defendant offers us no reason, and we see none, for concluding that because a statute enlarged the liability of the defendant it abrogated the right which the sovereign otherwise has to pursue common law remedies against tort-feasors in its own courts.[12] Since this suit is not based upon the False Claims Statute there is no other time limitation. It is well settled that the Government is not barred by any statute of limitations which is not made expressly applicable to it. United States v. Summerlin, 1940, 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283; see Guaranty Trust Co. v. United States, 1938, 304 U.S. 126, 132, 133, 58 S.Ct. 785, 82 L.Ed. 1224; Steele v. United States, 1885, 113 U.S. 128, 5 S.Ct. 396, 28 L.Ed. 952. The time limitation objection, therefore, we do not find to be well taken.

## II. Finality of an Executive or Administrative Decision.

■ Defendant points out that the Hackfeld property was returned to its former owner through an order signed by the President of the United States upon recommendation of the Attorney General of the United States. He states that under the law the President's decision was final and not subject to court review.[13] Therefore, the contention is, this action will not lie because it is an attempt to do the very thing which was not provided for in the law; that is, to get judicial review of the exercise of the discretion of the executive.

This argument will not stand up. In the first place, the effect of the return of the property has already been abrogated by court action. This action was the lawsuit in the Second Circuit against Hackfeld. While charges of fraud were there made,

sons, natural or artificial, they were not entitled to the same remedies for their protection. The restraints of the Constitution upon their sovereign powers cannot affect their civil rights. Although as a sovereign the United States may not be sued, yet as a corporation or body politic they may bring suits to enforce their contracts and protect their property, in the State courts, or in their own tribunals administering the same laws." Cotton v. United States, 1850, 11 How. 229, 231, 13 L.Ed. 675.

11 [1789] 3 Term Rep. 51. There is now developing in the federal courts the common law remedies for deceit and fraud which permit private investors to recover damages which occurred through violation of the security regulation acts despite the fact that no private remedy is given by the terms of these statutes. See, e. g., Goldstein v. Groesbeck, 2 Cir., 1944, 142 F.2d 422, 154 A.L.R. 1285, certiorari denied 1944, 323 U.S. 737, 65 S. Ct. 36, 89 L.Ed. 590; Baird v. Franklin, 2 Cir., 1944, 141 F.2d 238, certiorari denied 1944, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591.

12 Pope v. McCrady Rodgers Co., 3 Cir., 1947, 164 F.2d 591, is not at all inconsistent with this view. There the attempt was to avoid the impact of the statute of limitations where suit was brought on a claim which depended upon the statute which contained the time limitation for its existence. The claim was not known to the admiralty law.

13 50 U.S.C.A.Appendix, §§ 7, 9.

the case did not go off on any question of fraud, but was decided in the Government's favor on the ground that the seized property had been returned to him under a mistake of law.[14] The judgment obtained was a claim against the Hackfeld estate when, after its owner's death, there was administration in the courts of New York.

Furthermore, we think the argument itself is not sound. This action is not brought to review the exercise of Presidential discretion. It is, instead, one brought against those who are alleged to have deceived the officers of the Government by misstating facts to them on which the discretion was exercised. We see analogous situations in other places in the law. Thus, one who uses legal proceedings for an improper motive may find himself liable even though the result obtained in those proceedings is not in dispute.[15] Again, equity, under some circumstances, will enjoin one who has used fraud to obtain a judgment even though the time for appellate proceedings with regard to the judgment is long past.[16] This Court, furthermore, has held that words importing an intent that certain action is non-reviewable does not prevent judicial action when the assertion is that the action complained of was induced by fraud. In re Bowen, 3 Cir., 1943, 138 F.2d 22, 23, certiorari denied 1944, 320 U.S. 799, 64 S.Ct. 430, 88 L.Ed. 482. We there said:

"We may concede that by the section Congress clearly intended to provide that no court should review either the Commissioner's determination of the value of the whole or any part of property subject to a lien for taxes, or his determination of the amount which must be paid to the collector for a discharge of such a lien, but we cannot believe that by it Congress intended to go further and provide that the Government should be powerless to protect itself even in the event that its collector had been induced by fraud to discharge a valid tax lien. It seems to us that if Congress had intended to provide that the Government should be remediless against the perpetrator of a fraud upon it and thereby create an exception to the thoroughly well established rule that fraud renders transactions which it induces voidable, it would have said so in clear and unmistakable terms. In the absence of such terms we are of the view that Congress in the above section did not intend to tie the Government's hands under the circumstances here disclosed."

We think the point need not be labored further. In no sense can this action brought to recover for a tort be construed into judicial review of a Presidential action which by law was made non-reviewable.

## III. Is Plaintiff's Claim Settled Adversely by Former Adjudication?

There are two parts to this question. One has to do with merger; that is, the disappearance of a plaintiff's cause of action into a judgment obtained when suit is brought to enforce the claim.[17] The other has to do with the effect of a judgment in making facts found in litigation conclusive between the parties thereto in subsequent litigation. This phase deals largely with that part of res judicata called collateral estoppel,[18] but it also raises a full faith and credit problem.

 First, we shall consider the claim of merger. This theory is not very clearly set out by the defendant for he talks it in connection with the release of joint tortfeasors. It is quite clear here that there was no release given by the plaintiff to any defendant.[19] It is equally clear that the United States pursued successfully a claim

---

[14] United States v. Rodiek, 2 Cir., 1941, 117 F.2d 588, affirmed by an equally divided court 1942, 315 U.S. 783, 62 S.Ct. 793, 86 L.Ed. 1190.

[15] See Restatement, Torts (1938) § 682.

[16] See United States v. Gallucci, D.C. Mass., 1944, 54 F.Supp. 964; Hallett v. Slaughter, 1943, 22 Cal.2d 552, 559, 140 P.2d 3, 7; see Restatement, Judgments (1942) §§ 121, 122, 124.

[17] See Introductory Note to Chapter 3, Restatement, Judgments (1942).

[18] See Restatement, Judgments (1942) §§ 68–72; Scott, Collateral Estoppel by Judgment, 56 Harv.L.Rev. 1 (1942).

[19] The release signed by the United States Attorney concerned the New York Surrogate Court's decree, a proceeding hereinafter described, which was to pay what was left of the estate to the Government and in no way can it be construed into a release on the judgment obtained by the United States against Rodiek, the ancillary representative of the Hackfeld estate. We do not think

against Hackfeld's personal representative after Hackfeld's death to get back money which it had turned over to Hackfeld under a Presidential order. That was a suit in the Second Circuit against Rodiek, who administered Hackfeld's American estate in New York. Action was brought in the Southern District of New York. The judgment recovered there was affirmed by the Circuit Court of Appeals[20] and, subsequently, by an evenly divided vote in the Supreme Court of the United States.[21]

The facts stated so far do not constitute a defense in this action. It is well settled law in this country that a judgment for the plaintiff in an action against one tort feasor acting in concert with others does not preclude the plaintiff from later suing another.[22] This well settled rule of law gives the answer to this phase of the question.

If the judgment had been satisfied in full the situation might be quite different.[23] There was, however, no satisfaction of this judgment. Plaintiff received a large payment at the conclusion of the administration proceedings in New York, but that payment did not equal the amount of the judgment. It was a pro tanto discharge of liability of all the alleged joint tortfeasors no doubt.[24] But the Government's suit in this case is one predicated on the difference between what it got on the judgment against Rodiek and the total amount of the sum it claims was lost to it by fraud. There is, therefore, no merger.

Now we turn to the point of real difficulty, that of collateral estoppel. Here we apply federal law.[25] A classic statement of the judge-made rules of res judicata and the guiding principle for us in this case is the well known quotation from Cromwell v. County of Sac,[26] in which the Court said:

"In considering the operation of this judgment, it should be borne in mind, as stated by counsel, that there is a difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same parties upon a different claim or cause of action. In the former case, the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy,

---

that the proving of a claim against a dead man's estate and receiving what there is to be had in the administration of that estate constitutes a release of a joint tortfeasor.

20 United States v. Rodiek, 2 Cir., 1941, 117 F.2d 588.

21 1942, 315 U.S. 783, 62 S.Ct. 793, 86 L.Ed. 1190.

22 Lovejoy v. Murray, 1865, 3 Wall. 1, 18 L.Ed. 129; Lewis v. Ingram, 10 Cir., 1932, 57 F.2d 463, 1932, cert. denied 287 U.S. 614, 53 S.Ct. 16, 77 L.Ed. 533; see II Freeman, Judgments (1925) § 573; Restatement, Judgments (1942) § 94; Notes, 65 A.L.R. 1087 (1930), 27 A.L.R. 805 (1923). The rule in England was formerly to the contrary. Morton's Case [1584], Cro. Eliz. 30; Cocke v. Jennor [1603], Hobart 66. It has now been changed by statute and a judgment obtained against one no longer discharges all others jointly liable for the wrong. Law Reform Act, 1935 (25 & 26 Geo. 5, c. 30), s. 6; see Gahan, The Law of Damages (1936) 186.

23 Eberle v. Sinclair Prairie Oil Co., 10 Cir., 1941, 120 F.2d 746; Tandrup v. Sampsell, 1905, 234 Ill. 526, 85 N.E. 331, 17 L.R.A.,N.S., 852; Whittemore v. Judd

Linseed & Sperm Oil Co., 1891, 124 N.Y. 565, 27 N.E. 244, 21 Am.St.Rep. 708; Sarine v. Maher, 1946, 187 Misc. 199, 63 N.Y.S.2d 241; see Restatement, Judgments (1942) § 95; Restatement, Torts (1939) § 886.

24 Lovejoy v. Murray, 1865, 3 Wall. 1, 18 L.Ed. 129; In re Horowitz' Estate Sur., 1946, 64 N.Y.S.2d 4; See Restatement, Judgments (1942) § 95, Comment: e; Restatement, Torts (1939) § 885(3).

25 "Before Erie R. Co. v. Tompkins it was recognized by this Court that, apart from the full faith and credit clause, a judgment duly rendered in one court will be recognized as res judicata in a suit between the same parties in a federal court. [Citing cases]. It has been held in non-diversity cases, since Erie R. Co. v. Tompkins, that the federal courts will apply their own rule of res judicata." Heiser v. Woodruff, 1946, 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970.

26 1876, 94 U.S. 351, 24 L.Ed. 681. For a particularly good treatment of the differences between merger, bar and collateral estoppel, with illustrations of each see Restatement, Judgments (1942) § 68, Comment: a.

concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose. * * *

"But where the second action between the parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action." 94 U.S. 352, 353, 24 L.Ed. 681.

▮▮▮ The proposition is embodied in the statement of a general rule found in the Restatement of Judgments, § 68(1): "Where a question of fact essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties in a subsequent action on a different cause of action * * *."[27]

This rule is a rule of policy. Courts have concluded that it is more desirable to bring litigation to an end, once a party has had his day in court, than it is to allow parties to continue to contest further issues which have been heard and decided with the thought that a previous conclusion can be shown to be untrue and a later one true to the facts.[28]

Such a rule of public policy must be watched in its application lest a blind adherence to it tend to defeat the even firmer established policy of giving every litigant a full and fair day in court. Thus, a court in the application of good sense held that the rule of collateral estoppel did not apply to the findings of a small claims court where there were no formal pleadings, where there were no lawyers allowed and from which only one of the litigants was entitled to take an appeal.[29] Thus, too, the English Privy Council on appeal from the East Indies, with its eye on realities, held that the finding of a deputy commissioner of Sitapur was not final on the facts found by him, the Court saying: "* * * although it may be desirable to put an end to litigation, the inefficiency of many of the Indian Courts makes it advisable not to be too stringent in preventing a litigant from proving the truth of his case."[30] (page 204). So, too, it may be that the general rule is to be limited by considerations of the protection of the complete jurisdiction

---

[27] The exception noted to the rule of the subsection is dealt with later.

[28] "The doctrine of res judicata precludes the parties from showing what is or may be the truth. Why should not the truth prevail? The answer is based upon public policy. The interests of the state and of the parties require the putting of an end to controversies. One way of ending controversies is to preclude the bringing of an action after a period of time has elapsed, and thus a perfectly valid claim may be barred by a statute of limitations or by laches. The policy against relitigation is even stronger. If the validity or invalidity of a claim is established by a valid and final judgment, that claim cannot again be litigated. If an issue is actually litigated and determined, that issue cannot again be litigated between the parties even though it arises in an action based upon a different claim." Scott, Collateral Estoppel by Judgment, 56 Harv.L.Rev. 1 (1942).

[29] Sanderson v. Niemann, 1941, 17 Cal. 2d 563, 110 P.2d 1025; see 32 Calif.L. Rev. 655 (1941); Restatement, Judgments (1942) § 71, Comment: d. But where the litigants are afforded a full opportunity to litigate the matter before a tribunal having those qualities we ordinarily attach to a law court, the collateral estoppel is applied in the second law suit. Geracy v. Hoover, 1942, 77 U.S.App.D.C. 55, 133 F.2d 25, 147 A.L. R. 185; Canton-Hughes Pump Co. v. Llera, 6 Cir., 1913, 205 F. 209; Todhunter v. Smith, 1934, 219 Cal. 690, 28 P.2d 916; Allamong v. Falkenhof, 1930, 39 Ohio App. 515, 177 N.E. 789; see Sanderson v. Niemann, supra.

[30] Misir Rayhobardial v. Rajah Sheo Baksh Singh, L. R. 9 Indian Appeals 197 (1882). We do not, however, understand the court's remark to lay down a general criterion of judicial efficiency of the Indian Courts as to the operativeness of the rule of res judicata.

of designated courts to make final determinations on matters entrusted to them. Thus it is said that the findings of a state court in a suit incidentally involving the validity of a patent does not have the effect of a collateral estoppel since, by the Constitution this is a matter for Federal Court adjudication.[31] It may be, also, that because of the fetish of exclusive local authority over titles to local land that an adjudication of a court of another state as to a local land title is not to be given the effect of a collateral estoppel.[32] Likewise, the importance of determination of the marriage status of a state's citizens may prevent a collateral estoppel to be given to a minor court designated only to hear claims for pecuniary support by one spouse against another.[33]

All these instances, we think, are clearly understandable limitations upon a general rule imposed to prevent that general rule from working injustice through depriving the party of a chance for a fair hearing or to preserve some policy which seems so strong as to prevent the operation of a general rule in a particular situation. The Restatement of Judgments, § 71, phrases the exception in the following language: "Where a court has incidentally determined a matter which it would have had no jurisdiction to determine in an action brought directly to determine it, the judgment is not conclusive in a subsequent action brought to determine the matter directly." It was upon this statement that the District Court relied in holding that the Surrogate's decree in New York was not conclusive in the lawsuit in the District Court for the District of New Jersey.

To understand the application of these principles of law to the immediate litigation it will be necessary to relate a little more fully the history of what happened in New York concerning the Hackfeld matter.

As said above, an action had been brought by the United States in the Federal Court in New York to get back from Hackfeld's personal representative the value of property turned over by the Alien Property Custodian to Hackfeld in Hackfeld's lifetime. Both fraud and payment under a mistake of law were charged in the Government's complaint in that suit, but the decision was made, and this is perfectly clear in the Circuit Court's opinion,[34] on the ground that the money was paid on the mistake of law and that the fraud issue was not determined. The United States, having got its judgment, then sought to get its money through a claim in the administration proceedings of Hackfeld's estate in the Surrogate's Court in New York. The first position it took was that it came in ahead of the administration expenses on the theory that there was a constructive trust and the claimant was following the trust res. This point must have been fought out with considerable thoroughness because Surrogate Foley, in the opinion disposing of the matter, went into it in detail. He decided that the United States had won its victory in the Federal Court on a claim to recover money under a mistake of law, that it was not the beneficiary of a trust, and that it came in as a creditor who was entitled to be paid after the administrative expenses in the probate proceedings had been allowed and paid.[35]

Then the United States filed objections to the allowance of fees to Silliman who had acted as counsel for Rodiek, the ancillary representative of the Hackfeld estate. It also claimed a surcharge against Silliman alleging that he had received money from the estate which should be returned on the theory that the alleged conspiracy with which he, Hackfeld, and Rodiek participated in made these payments wrongful. More will be said about this later. The

---

[31] See Restatement, Judgments (1942) § 71, *Comment:* c.

[32] Restatement, Judgments (1942) § 71, *Comment:* b.

[33] Loomis v. Loomis, 1942, 288 N.Y. 222, 42 N.E.2d 495, reversing 1941, 262 App.Div. 906, 28 N.Y.S.2d 809, noted 147 A.L.R. 196. See this annotation for the authorities on all phases of the point under discussion.

[34] "This conclusion makes unnecessary any consideration of the evidence as to the allegations of fraud in procuring the presidential order under which payments were made to him." United States v. Rodiek, 2 Cir., 1941, 117 F.2d 588, 594, affirmed by an equally divided court 1942, 315 U.S. 783, 62 S.Ct. 793, 86 L.Ed. 1191.

[35] Matter of Hackfeld, 1943, 180 Misc. 406, 40 N.Y.S.2d 60.

final conclusion reached by the Surrogate's Court was the overruling of objections in the allowance of counsel fees and a refusal to surcharge Silliman.

To apply the law to the facts thus stated we must answer two questions: (1) Did the New York decree adjudicate the question of the alleged fraud of Silliman in connection with the return of the Hackfeld property? (2) If it did, does that adjudication work a collateral estoppel against the Government in this litigation?

### (1) Did the Surrogate decide the fraud question?

 Did the Surrogate's Court pass on the question of alleged fraud of the defendant, Silliman? The answer to this question depends upon what we may learn concerning the litigation there. As stated above, the Government put in objections to the payment of fees to Silliman as counsel for the estate.[36] There was also involved a question of another proceeding on behalf of the Hackfeld interests. After the Presidential order releasing the Hackfeld property from the Alien Property Custodian, a bill was introduced into the Senate for payment of an additional sum to Hackfeld. This matter was referred to the Court of Claims, which eventually made an adverse report and the whole thing dropped. The Government objected, in the Surrogate proceeding, to any payment to Silliman for services in the Court of Claims proceeding, alleging fraud. But the Surrogate's final decree expressly omitted any consideration of this Court of Claims proceeding on the ground that it was covered by a separate contingent fee agreement, and presented no point for adjudication by the Surrogate's Court. Government objections based upon matters arising out of that proceeding were withdrawn by the Government. So the final New York Surrogate decree had nothing to do with anything before the Court of Claims.

Nevertheless, the objections made by the United States to an allowance to Silliman for services rendered the Hackfeld estate

---

[36] These were numbered objections II, III, and V. The Government withdrew objection V and desisted in pressing II when it was informed that the fee allowance had nothing to do with the Court of Claims matter. But it continued to press objection III. This objection reads as follows:

"III. Objects generally to all disbursements and payments of fees to Reuben D. Silliman and requests a surcharge against him of all sums heretobefore received by him from the estate upon the ground (asserted upon information and belief) that he, as attorney for the decedent, Johann Friedrich Hackfeld, personally participated in the filing and prosecution of the false and fraudulent claim against the United States in 1923 and 1924 with full knowledge of its falsity; that said Reuben D. Silliman brought about the illegal and erroneous transfer and payment to the decedent largely by causing the payment by the decedent of money to a vice consul of the United States charged with making recommendations to the Secretary of State on the decedent's citizenship, and by personally bribing said vice consul who reported favorably on an application of the decedent for an American passport which was obtained as a means of inducing favorable consideration by officials of the United States of the decedent's notice of claim as an American citizen under section 9 of the Trading with the Enemy Act; that said Reuben D. Silliman was and is primarily responsible for the prosecution of the proceeding in the United States Court of Claims referred to in paragraph II, *supra*, and that he accepted payment of all of said fees and disbursements with knowledge of the insubstantial speculative and fraudulent nature of the claim asserted against the United States in the Court of Claims.

"Reuben D. Silliman should have ceased to serve as attorney for the ancillary executor when the Government, in the Court of Claims, on July 7, 1938, produced evidence showing that Silliman had been party to bribery of an American consular officer as a step in securing the allowance of the fraudulent claim which Hackfeld had filed with the Alien Property Custodian and Silliman himself assumed the role of a witness to deny his part in the transaction. See Canon 19 of the Canons of Ethics of the American Bar Association.

"On December 5, 1942, the United States filed in the United States District Court for New Jersey, at Trenton, New Jersey, a complaint for damages against said Reuben D. Silliman as a joint tort feasor resulting from his complicity in the filing and prosecution of the false and fraudulent claim of Johann F. Hackfeld. *This action is now pending.*"

on the ground of fraud in the 1923 proceeding remained. They were before, and remained before, the Surrogate. The final order of that Court was a long and elaborate document. It recited, in extenso, the objections which had been made by the Government to the Silliman claim and concluded by overruling all objections and making an allowance for various attorneys' fees and the disposition of the corpus of the estate. The defendant tells us in an affidavit attached to his answer, and the United States does not contradict the statement, that the United States endeavored to secure a modification of the order by the insertion of a statement to the effect that the charges of fraud were not determined by the Surrogate, but that the Surrogate refused such a modification of the order.

■ Whether the Government in the Surrogate proceedings introduced evidence in support of the allegation that the defendant was guilty of fraud in 1923, we learn only from affidavits of the lawyer who represented Silliman there and the lawyer who represented the Government there.

These affidavits were before the District Court. It actually does not matter whether such evidence was presented or not. If an issue is raised and the party who has the burden fails in his proof and the issue is decided against him, he is just as much bound by collateral estoppel as though he had presented a barrel of testimony.[37] A man cannot offer his cake and expect to keep it in litigation any more than anywhere else.

The District Judge, in a carefully considered opinion, stated with regard to the allegations before the Surrogate: "The allegations contained in objections and those set forth in the amended complaint are unquestionably grounded on the same alleged facts and evidence." Then he went on to settle the question on the basis that those findings, nevertheless, did not bind the plaintiff here. We think the District Judge was right in the statement of fact above quoted. The objections were certainly there before the Surrogate. He set them up one by one in his elaborate order and then proceeded to disallow them.[38]

[37] O'Brien v. Manwaring, 1900, 79 Minn. 86, 81 N.W. 746, 79 Am.St.Rep. 426; Slater v. Skirving, 1897, 51 Neb. 108, 70 N.W. 493, 66 Am.St.Rep. 444; " * * * * if a question of fact is put in issue by the pleadings, and at the trial the party who has the burden of proof offers no evidence in support of his allegations, and the court directs a verdict against him, the question is litigated and a judgment on the verdict is conclusive between the parties as to the question. * * * Even if a question of fact is not put in issue by the pleadings yet if evidence is offered in regard to it and it is submitted to the trier of facts for determination, and is determined, the question is litigated and the judgment is conclusive as to the question in a subsequent action between the parties." Restatement, Judgments (1942) § 68, Comment: f.

[38] "Having objected generally to all disbursements and payments of fees to Reuben D. Silliman and requested a surcharge against him for all sums heretofore received by him from the estate upon the ground (alleged upon alleged information and belief) that said Reuben D. Silliman, as attorney for the decedent herein, had personally participated in the filing and prosecution of the alleged false and fraudulent claim against the United States for the return of Hackfeld's property in 1923 and 1924, with alleged knowledge of its alleged falsity, and had brought about the alleged illegal and erroneous transfer and payment to the decedent by the United States of America, by allegedly causing the decedent to pay money to a Vice Consul of the United States of America and (as alleged) personally paying money to said Vice Consul and (as alleged) that said Reuben D. Silliman should have ceased serving as attorney for the Ancillary Executor at the time when (as it is alleged) the United States produced evidence showing that Reuben D. Silliman had been party to the alleged payment of money to the American Consular officer (General Objection 'III'); and

* * * * * * *

"Now, upon all the proceedings heretofore and here and due deliberation having been had it is

"Ordered, adjudged and decreed that the objections of the United States of America numbered and designated 'I', 'II', 'III' and 'IV' * * * be and the same hereby are in all respects overruled; and it is further

* * * * * * * *

"Ordered, adjudged and decreed that all objections of the United States of America, the objectant herein, to the pay-

We think the Surrogate decided the issues directly raised "in the pleadings" by the objections filed by the Government against the allowance of the Silliman claim or claims.[39] We have a recital in the Court's order of those objections. Then we have the determination by the Court in which it makes an adverse decision upon them. It is true we have no opinion nor have we the familiar findings of fact and conclusions of law to which we are accustomed under the Federal practice. Nevertheless, we think the record is complete, for it recites points made in the pleadings and the action of the Court upon them. This is not a situation where the record is devoid of information and needs outside evidence to explain what went on. The Government took no appeal.[40] Therefore, whether the conclusion of the learned Surrogate was right or wrong is not now a question which is open to litigation.[41]

(2) Does the Surrogate's decree end this litigation?

 (a) Collateral estoppel.

█ Our conclusion on this point is at variance with that reached by the learned District Judge in his thoughtful and able opinion. We do not think that the decree of the Surrogate Court of New York comes within the exception to the general rule of collateral estoppel which we have set out above.

In reaching this conclusion we are not helped very much by the distinction sometimes suggested by courts of "general" and "limited" jurisdiction. Every court in the country is limited, including even the Supreme Court of the United States. In one sense, all Federal Courts have limited jurisdiction. At common law both the King's Bench and the Court of Common Pleas were courts of limited jurisdiction because equitable matters went to the Court of Chancery and a very wide field of litigation was fenced off by the authority of the ecclesiastical courts. So we think that nothing can turn here on the labels "limited" and "general" which merely, at most, indicate differences of degree.

When we examine the authority of the Surrogate's Court of the State of New York we cannot but conclude that it is a court of very broad powers. It is provided for in the Constitution of the State.[42] The statute which relates to its jurisdiction is set out in the margin.[43] It gives the court jurisdiction to try and determine all ques-

---

ment of attorney's fees and disbursements to Reuben D. Silliman and the request of the United States of America that said Reuben D. Silliman restore to the estate all moneys heretofore paid to him from the estate as and for attorney's fees and disbursements, as prayed for in its written objections and as asserted upon the trial of the issues herein, be and the same hereby are in all respects overruled and denied; * * *." Surrogate Foley's decree entered on the 17th day of April, 1944.

[39] See Restatement, Judgments (1942) § 68, *Comment:* f.

[40] In a letter dated April 25, 1944, the United States Attorney stated: "I have today been advised by the Attorney General that the Government will take no appeal from Surrogate Foley's decree entered on the 17th day of April, 1944. * * *"

[41] Chicago, R. I. & Pac. R. Co. v. Schendel, 1926, 270 U.S. 611, 617, 46 S.Ct. 420, 70 L.Ed. 757, 53 A.L.R. 1265; cf. Baltimore S. S. Co. v. Phillips, 1927, 274 U.S. 316, 325, 47 S.Ct. 600, 71 L.Ed. 1069; Hartmann v. Time, Inc., 3 Cir., 1948, 166 F.2d 127.

[42] N.Y.Const. Art. VI, § 13.

[43] "Each surrogate must hold, within his county, a court, which has, in addition to the powers conferred upon it, or upon the surrogate, by special provision of law, jurisdiction, as follows:

"To administer justice in all matters relating to the affairs of decedents, and upon the return of any process to try and determine all questions, legal or equitable, arising between any or all of the parties to any proceeding, or between any party and any other person having any claim or interest therein who voluntarily appears in such proceeding, or is brought in by supplemental citation, as to any and all matters necessary to be determined in order to make a full, equitable and complete disposition of the matter by such order or decree as justice requires." * * * Surrogate's Court Act, L.1920, Ch. 928 § 40.

The statute says further: "Every decree of a surrogate's court is conclusive as to all matters embraced therein against every person of whom jurisdiction was obtained. To such decree there is attached all the presumptions pertaining to a judgment rendered by a court of

tions, arising not only between a person and the estate but between two persons who have a claim against an estate. It also has the power to adjust a controversy between those who voluntarily appear or who are brought in by supplemental citation although the matter requires the issuance of an order to liquidate a partnership.[44] And it has jurisdiction to determine matters brought before it in connection with an estate even though it must resolve an issue over which the Supreme Court, the original court of general jurisdiction in New York, has concurrent jurisdiction.[45] It can, moreover, determine whether fraud existed in connection with a release and set aside, the same if fraud is shown.[46] It could therefore, pass on the legality of a lawyer's claim for fees for an estate. It could certainly preclude him from recovery if, because of misconduct, he was claiming something he was not entitled to have.

To us this spells broad and authoritative jurisdiction for the Surrogate's Court. We conclude that it is not the type of tribunal whose fact findings should not be taken as conclusive between the parties in subsequent suits. This concept of its functions finds support from our brethren in the Second Circuit, who are closer to it than we. They have recently commented on this broad jurisdiction and stated that a finding of no fraud by the Surrogate would be

conclusive in the Federal Court if such a finding had been made.[47] We think, further, that the public policy of holding parties to one day in court is one which has recently found firm support and sound extension by the court whose authority binds us.[48] We should not be looking for an opportunity to impose any but the most important limitations on that policy.

We do not think, furthermore, that if the Surrogate Court had this fraud question before it and, as pointed out above, answered it, that the determination was incidental to its judicial business, but that it was a determination made in the doing of the very thing which the Court was empowered to do. Nor was the determination of these issues, first the constructive trust theory and then the charge of fraud on Silliman's part in 1923, incidental in the sense that they came into the case in an offhand manner or by way of digression. The Government's whole activity in the Surrogate's Court was for the purpose of showing that it should come ahead of the normal administration expenses for, as previously stated, the Hackfeld estate being less than the amount of the Government's judgment it was to its advantage to have these expenses subordinated. In other words, it was trying to get approximately $60,000, the amount of Silliman's fees, by this assertion of fraud. It seems to us inaccurate to call

general jurisdiction in a common law action." Surrogate's Court Act, L.1920, Ch. 928, as amended L.1938, Ch. 157, § 80.

[44] Raymond v. Davis' Estate, 1928, 248 N.Y. 67, 161 N.E. 421; cf. Connecticut v. State Tax Commission of State of New York, 1935, 266 N.Y. 283, 194 N.E. 756.

[45] In re Deutsch's Estate, 1945, 186 Misc. 446, 56 N.Y.S.2d 768 (jurisdiction to determine ownership of stock which allegedly was being withheld from the estate).

[46] In re Winslow's Estate, 1934, 151 Misc. 298, 272 N.Y.S. 829; In re Frame's Estate, 1926, 128 Misc. 788, 219 N.Y.S. 759, affirmed without opinion 1931, 234 App.Div. 748, 254 N.Y.S. 917.

[47] See Griffith v. Bank of New York, 2 Cir., 1945, 147 F.2d 899, 902, 160 A.L.R. 7340, certiorari denied 1945, 325 U.S. 874, 65 S.Ct. 1414, 89 L.Ed. 1992.

[48] Cf. Sealfon v. United States, 1948, 332 U.S. 575, 68 S.Ct. 237; Angel v. Bullington, 1947, 330 U.S. 183, 67 S.Ct. 657;

Heiser v. Woodruff, 1946, 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970; Treinies v. Sunshine Mining Co., 1939, 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85; Oriel v. Russell, 1929, 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419 (principle reaffirmed in Maggio v. Zeitz, 1948, 68 S.Ct. 401); Myers v. International Trust Co., 1923, 263 U.S. 64, 44 S.Ct. 86, 68 L.Ed. 165 (finding of no fraud on part of bankrupt in bankruptcy court precludes creditor from recovery in subsequent action of deceit against bankrupt). Burt v. Union Central Life Ins. Co., 1902, 187 U.S. 362, 23 S.Ct. 139, 47 L.Ed. 216 (criminal conviction in state court res judicata of fact of beneficiary killed insured in suit on insurance policy in federal court); see also Austin v. United States, 7 Cir., 1942, 125 F.2d 816 (same); Bee Mach. Co. v. Freeman, 1 Cir., 1942, 131 F.2d 190, affirmed 1943, 319 U.S. 448, 63 S.Ct. 1146, 87 L.Ed. 1509; Bennett v. Forrest, 1944, 24 Cal.2d 485, 150 P.2d 416, 422.

this incidental, for it was all that remained of the Government's case once the constructive trust theory had been rejected by the Surrogate. Our conclusion is, therefore, that the Surrogate's decree was conclusive on the question of fraud and should so have been taken in the trial in the District Court.

(b) Full faith and credit.

 The foregoing determination on this phase of the collateral estoppel question has been on the basis of what we think is the correct application of the principles of res judicata now fairly well marked out by the courts as part of the common law.[49] There is, however, another and compelling reason why the result is the proper one even if the Federal Court law on collateral estoppel were contrary to what is set forth above. That ground is predicated upon the full faith and credit clause[50] of the Constitution and the statute[51] enacted to carry out the concept expressed therein.

 Now it is pretty clear that the determination of the non-existence of fraud by the Surrogate's Court in New York would be of conclusive effect whenever that fact became relevant in another lawsuit in the Surrogate's or any other court in New York. Section 80 of the Surrogate's Court Act[52] which describes the effect to be given to such decrees states:

"Every decree of a surrogate's court is conclusive as to all matters embraced therein against every person of whom jurisdiction was obtained. To such decree there is attached all the presumptions pertaining to a judgment rendered by a court of general jurisdiction in a common law action." Any doubts that this section means anything less than what the words purport are dispelled by an examination of the New York cases. Thus, in a suit in the court of general civil jurisdiction the question whether a release was secured by fraud was raised but its determination foreclosed on the ground that it had already been settled by the Surrogate's Court when it approved the compromise of the claim.[53] In that instance the court stated that "so long as [the Surrogate's decree stands it] conclusively establishes plaintiff's knowledge of what she was doing and excludes this phase of her claim of fraud." Other cases in which the issue has come up held likewise following the clear language of the section previously quoted.[54] That being so we think the conclusion inescapable that the decree must have the same effect when relied upon in the court of another state. The full faith and credit clause "compels that controversies be settled so that where a state court has jurisdiction of the parties and subject matter the judgment controls in other states to the same extent as it does in the state where rendered."[55]

---

[49] Cf. "But even if full faith and credit is not commanded, there is nothing in the Constitution and laws of the United States which requires a court of a state to deny relief upon a judgment because it is for taxes. A state court, in conformity to state policy, may, by comity, give a remedy which the full faith and credit clause does not compel." Milwaukee County v. White Co., 1935, 296 U.S. 268, 272, 56 S.Ct. 229, 231, 80 L. Ed. 220.

[50] "Full Faith and Credit shall be given in each State to the public Acts, Records, and Judicial Proceedings of every other State. And the Congress may, by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U. S.Const. Art. IV § 1.

[51] "And the said records and judicial proceedings, so authenticated, shall have such faith and credit given to them in

every court within the United States as they have by law or usage in the courts of the State from which they are taken." Rev.Stat. § 905, 28 U.S.C.A. § 687.

[52] Surrogate's Court Act, L.1920, Ch. 928, as amended L.1938, Ch. 157, § 80.

[53] McNamara v. Eastman Kodak Co., 1921, 232 N.Y. 18, 133 N.E. 113, 114.

[54] Robinson v. Bogert, 1946, 187 Misc. 735, 737, 64 N.Y.S.2d 152; Von Meyer v. Varcoe, 1919, 106 Misc. 426, 175 N.Y.S. 826; Beakes Dairy Co. v. Berns, 1910, 139 App.Div. 733, 124 N.Y.S. 365; see Connecticut v. State Tax Commission of State of New York, 1935, 266 N.Y. 283, 194 N.E. 756; cf. In re Grier's Estate, 1942, 178 Misc. 512, 35 N.Y.S.2d 9; In re Cullen's Estate, 1937, 163 Misc. 410, 297 N.Y.S. 280; In re Lachenmeyer's Estate, 1928, 144 Misc. 678, 258 N.Y.S. 641.

[55] Riley v. New York Trust Co., 1942, 315 U.S. 343, 349, 62 S.Ct. 608, 612, 86 L.Ed. 885.

Therefore, this decree prevents the litigation of a matter already determined in New York in the courts of another state for the collateral estoppel division of res judicata is included within that clause.[56] And, although judicial proceedings in the Federal Courts were not explicitly included within the language of the Constitution, it has been held by the Supreme Court that full faith and credit must be afforded to a state court's judgment when brought into relevancy in a Federal tribunal.[57] This consideration ends the plaintiff's case.

## IV. Conclusion.

The defendant raises numerous other questions. One very important, and none too easy point is whether the proof offered at this trial is sufficient to sustain the finding of the jury in favor of the plaintiff and the judgment entered thereon. Another has to do with the refusal of character testimony offered by the defendant. Another has to do with the failure of the Trial Judge to give certain instructions asked for by the defendant and involves in it the question whether the charge as given did not adequately cover the points. In view of our conclusion upon the question of res judicata these matters become irrelevant. If it is correct, and we believe it to be correct or we would not announce it, the defendant wins this case. We shall, therefore, not prolong this already too long discussion by a consideration of the other points.

The judgment of the District Court of New Jersey will be reversed and the case remanded with an order to enter judgment for the defendant.

[56] Chicago, R. I. & Pac. R. Co. v. Schendel, 1926, 270 U.S. 611, 46 S.Ct. 420, 70 L.Ed. 757, 53 A.L.R. 1265; Everett v. Everett, 1909, 215 U.S. 203, 30 S.Ct. 70, 54 L.Ed. 158; see Mr. Justice Black, dissenting in Magnolia Petroleum Co. v. Hunt, 1943, 320 U.S. 430, 450, 457, 64 S.Ct. 208, 88 L.Ed. 149, 150 A.L.R. 413; cf. Riley v. New York Trust Co., 1942, 315 U.S. 343, 350, 62 S.Ct. 608, 86 L.Ed. 885; In re Roeben's Will, 1939, 171 Misc. 548, 13 N.Y.S.2d 53; President etc., of Bank of United States v. Merchants' Bank of Baltimore, 1848, 7 Gill., Md., 415.

[57] Milwaukee County v. White Co., 1935, 296 U.S. 268, 56 S.Ct. 229, 80 L.Ed. 220; American Surety Co. v. Baldwin, 1932, 287 U.S. 156, 53 S.Ct. 98, 77 L.Ed. 231, 86 A.L.R. 298; Durlacher v. Durlacher, 9 Cir., 1941, 123 F.2d 70, certiorari denied 1942, 315 U.S. 805, 62 S.Ct. 633, 86 L.Ed. 1204; see Rashid, The Full Faith and Credit Clause, Collateral Attack of Jurisdictional Issues, 36 Georgetown L.Rev. 154, 155 (1948).